JUDGE SCHEINDLIN

12 CIV 7465

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------x

LOTES CO., LTD.,

        Plaintiff

v.

HON HAI PRECISION INDUSTRY CO., LTD.; Ltd.
FOXCONN INTERNATIONAL HOLDINGS, INC.;
FOXCONN INTERNATIONAL, INC.; FOXCONN
ELECTRONICS, INC.; and FOXCONN (KUNSHAN)
COMPUTER CONNECTOR CO., LTD.

        Defendants.

------------------------------------------x

-CV-

**JURY TRIAL DEMANDED**

**COMPLAINT FOR: BREACH OF
CONTRACT; PROMISSORY
ESTOPPEL; WAIVER; TORTIOUS
INTERFERENCE WITH CONTRACT;
DECLARATORY RELIEF; AND
VIOLATON OF THE SHERMAN ACT
(15 U.S.C. §§ 1, 2)**

Lotes Co., Ltd. ("Lotes" or "Plaintiff") complains and alleges as follows against Hon Hai

Precision Industry Co., Ltd.; Foxconn International Holdings, Inc.; Foxconn International, Inc.;

Foxconn Electronics, Inc.; and Foxconn (Kunshan) Computer Connector Co., Ltd. (collectively,

"Defendants").

## THE PARTIES

1.     Lotes is a Taiwan corporation with a place of business at No. 15, Wusyun St.,

Anle District, Keelung City, 20446 Taiwan, R.O.C. ("Lotes"). Lotes is traded on the Taiwan

Stock Exchange Corporation (TSEC) under the code 3533.

2.     Defendant Hon Hai Precision Industry Co., Ltd. is a Taiwan corporation with a

place of business at 2, Tzu Yu Street, Tu-cheng District, New Taipei City, 23678 Taiwan, R.O.C.

("Hon Hai"). On information and belief, Hon Hai is one of the largest companies in Asia and is a

giant multinational electronics manufacturer that is one of the world's largest makers of

electronic components, including connectors and cable assemblies for use in PCs, such as

1

Universal Serial Bus ("USB") 3.0 connectors.  On information and belief, as of April 2012. Hon Hai had a market capitalization of approximately $37.8 billion, annual sales of $102.74 billion (2011) and employed over one million people in its many factories in China and around the world.  On information and belief, Hon Hai is traded on the TSEC under the code 2317 and on the London Stock Exchange (LSE) under the symbol HHPD.

3.      Defendant Foxconn International Holdings Ltd. is a Cayman Islands corporation with a registered office at Scotia Centre, 4th Floor, P.O. Box 2804, George Town, Grand Cayman. Cayman Islands with places of business located at 8/F., Peninsula Tower, 538 Castle Peak Road, Cheung Sha Wan, Kowloon, Hong Kong and 1705 Junctions Court. Suite 200, San Jose. California 95112 ("Foxconn International CI").  On information and belief, Foxconn International CI is an original design manufacturer ("ODM") providing vertically integrated manufacturing services for consumer electronics.  On information and belief, Foxconn International CI specializes in manufacturing services that include designing and manufacturing precision tools and molds, product development, and manufacturing of components, such as USB 3.0 connectors.  On information and belief, by way of the Foxconn companies in China. Foxconn International CI is one of the largest exporters from China, and most of these products enter the United States through ports in California.   On information and belief, Foxconn International CI is traded on the Hong Kong stock exchange (SEHK) under the code 2038.

4.      Defendant Foxconn International, Inc. is a California corporation with a place of business at 1650 Memorex Drive. Santa Clara, California 95050 ("Foxconn International USA"). On information and belief, Foxconn International USA receives products from other Foxconn companies for distribution within these United States.

5.      Defendant Foxconn Electronics, Inc. is a California corporation with places of

business located at 288 S. Mayo Avenue, City of Industry, California 91789 and 1688 Richard

Avenue, Santa Clara, California 95050 ("Foxconn Electronics"). On information and belief,

Foxconn Electronics provides design and development, manufacturing, assembly, and after-sales

services to computer, communication, and consumer-electronics companies in the United States

and internationally. On information and belief, Foxconn Electronics manufactures mother

boards, graphic cards, chassis, coolers, and personal computers.

6.      Defendant Foxconn (Kunshan) Computer Connector Co., Ltd. is a China

corporation with a principal place of business at 999 Beimen Road, Yushan Township, Kunshan,

Jiang Su Province, P.R.C. ("Foxconn Kunshan"). On information and belief, Foxconn Kunshan

is an ODM that builds numerous consumer electronics products and components for shipment

into the United States, such as Apple's iPhone, iPod and iPad, including USB 3.0 computer

connector products.

## NATURE OF THE ACTION

7.      This action arises under the antitrust laws of the United States 15 U.S.C. § 1, *et*

*seq.* for antitrust behavior and unfair business practices stemming from the material breach by

the Defendants of their contractual obligations and public promises to license their patents on

USB 3.0 connectors as part of membership in the USB standards setting organization ("SSO"),

and for the Defendants' abuse of their participation in the SSO. The antitrust acts of Hon Hai

were aided and abetted in a conspiracy with the knowing cooperation of Foxconn International

CI, Foxconn Electronics, Foxconn International USA and Foxconn Kunshan (collectively,

"Foxconn"). Additional causes of action are brought against Defendants for breach of contract,

promissory estoppel, waiver, tortious interference in contract, and declaratory relief.

## JURISDICTION AND VENUE

8.     The Court has subject matter jurisdiction pursuant to the Sherman Act, 15 U.S.C. §§ 1, 2, 15, 26 (antitrust); 28 U.S.C. §§ 1331, 1337 (federal question); 28 U.S.C. §§ 2201, 2202 (declaratory judgment); and 28 U.S.C. § 1367 (supplemental jurisdiction).

9.     This Court has personal jurisdiction over Defendants because, on information and belief, Defendants have executed the USB 3.0 Contributors Agreement ("Contributors Agreement") wherein the Defendants agreed to submit themselves to the jurisdiction of the federal courts sitting in New York, New York for the causes of action alleged in the Complaint stemming from their breach of the Contributors Agreement.  In addition, the acts by the Defendants cause injury to Lotes in this District.  Moreover, the Defendants have minimum contacts with this forum as a result of business regularly conducted within the State of New York and the Southern District of New York ("this District") which business activities derive substantial revenue from the sale of products within this District, expect their actions to have consequences within this District, and derive substantial revenue from interstate and international commerce.

## VENUE

10.     Venue is proper over Defendants within this District under 28 U.S.C. §§ 1391 (b), (c).  In addition, on information and belief, Defendants have executed the Contributors Agreement wherein the Defendants agreed to submit themselves to venue in the federal courts of New York, New York, which includes this District, for the causes of action alleged in the Complaint.  Furthermore, venue is proper because Lotes has suffered harm in this District. Moreover, Defendants derive substantial revenue from sales in this District.

## FACTS

11.     Lotes was founded in Keelung, Taiwan in 1986 and specializes in the design and manufacture of connectors, CPU sockets, coolers and antennas, primarily for notebook computers. The annual sales of Lotes were approximately $255 million for 2011. One type of connector manufactured by Lotes is the Universal Serial Bus (USB) 3.0 connector. The USB 3.0 connector is the latest generation of USB connector and a significant improvement over the USB 2.0 connector, providing for much faster data rates. Used primarily to connect computer peripherals to personal computers, the USB 3.0 connector allows, for example, digital cameras, external hard drives, keyboards, computer mice and many other peripherals to transmit data between the peripheral and a computer over a standardized data link. Lotes competes directly with the Defendants in the making and selling of USB 3.0 connectors.

### STANDARDS IN THE COMPUTER INDSUSTRY

12.     There are many standards covering the interfaces between peripherals and computers. To facilitate interoperability among chip makers, device makers and computer manufacturers, among others, companies participate in the development of technical standards that establish precise specifications for the interfaces, such as the connectors, between devices. Once the standards are established, competing manufacturers can offer their own products that are compliant with the standard and are able to connect with other devices thus enhancing their value.

13.     Technical standards play a critical role in development of computer/peripheral interoperability and have the potential to encourage innovation and promote competition. Product designers and manufacturers are more willing to invest in computer products because, so long as they are compliant with the interface standard, the products will operate effectively with numerous third party products.

5

14.     Standards development also reduces costs for both suppliers and purchasers. For suppliers, standardization reduces the need to develop product to a particular purchaser's specifications. When a product may be sold to multiple purchasers and distributed more widely, manufacturing volumes increase and per unit costs decrease. Purchasers benefit from increased price competition among suppliers. Because many suppliers make standards-compliant products, switching suppliers typically does not require a substantial redesign of a purchaser's products or a substantial technical transfer to enable the new supplier to produce compatible products. The lower "switching cost" intensifies competition among suppliers, leading to lower prices.

15.     On the other hand, technical standardization also creates a "lock-in" effect and the risk of "patent hold-up." Although standards are the result of coordination and compromise amongst competitors, certain aspects of standards may be - and often are - claimed by patents. Before standardization, the royalty a patentee can earn from a patent license for its technology is limited in part by the availability of alternative technical approaches to perform that function. If a standard requires a designer to employ that patented technology, however, those other technological approaches are no longer available substitutes and no longer constrain the patentee's ability to demand royalties far in excess of what is warranted by the intrinsic value of the technology. Standards bodies are created so that everyone can follow the standard without fear of litigation.

16.     The USB Implementers Forum, Inc. ("USB-IF") is the managing SSO for USB specifications. The USB-IF oversees and coordinates the standards for all USB connectors, including USB 3.0 connectors. To prevent fear of litigation from inhibiting the progress of technological cooperation, intellectual property rights ("IPR") policies are commonly introduced by SSOs that bind all who participate in the SSO. For example, participants owning necessary

6

IPR used to implement the standard must agree to license their IPR to other participants for a fair, reasonable and non-discriminatory royalty ("FRAND" or "RAND"). Some SSOs, like USB-IF, require that no royalty be required for necessary patents (i.e., necessary to practice the standard), also known as RAND-Zero or RAND-Z terms.

17.     Without certain rules SSOs would be illegal trusts because SSOs are a forum in which competitors determine which products will and will not be made. To prevent patent owners from imposing monopolistic royalties and to mitigate the threat of a single patent owner from holding-up the industry, SSOs condition the standardization of proprietary technology upon the owner's promise to make the technology available to the public for a reasonable and non-discriminatory royalty or royalty free; i.e., on RAND or RAND-Zero terms, respectively. In exchange for having its technology included in the standard, for having the SSO promote the standards world-wide, and for having the industry directed to use its patented technology, each SSO member trades away the right to refuse to license its intellectual property to anyone willing to license on RAND terms. In short, the promise of RAND licenses is the quid pro quo of the bargain struck between the SSO and the intellectual property owner.

### PROMISES MADE BY HON HAI AND FOXCONN TO THE STANDARDS SETTING ORGANIZATION

18.     By way of background, on information and belief, Hon Hai was founded in 1974 as an electrical connector company. Today, on information and belief, Hon Hai is ranked 43rd on Fortune's Global 500 and is the largest manufacturer of consumer electronics in the world, making and assembling consumer products for brands such as Apple, Dell, Hewlett-Packard, Motorola, Nintendo, Sony and Nokia, to name a few. On information and belief, Hon Hai invested in Foxconn International CI to manufacture goods in China and other places. See http://www.foxconn.com. The Defendants are multi-national companies, and the organization

7

and relationship between these entities is difficult to determine and unknown at this time.  What is known is that consumer brand companies contract with Foxconn to manufacture their goods, typically in Foxconn's factory cities in China.

19.     As introduced above, Foxconn is an ODM.  An ODM designs and manufactures a specified product which is branded by another company.  This allows the branding firm to produce a product without having to build, organize and run a factory.  This business model goes by the term "outsourcing."  Brand name consumer electronics companies use outsourcing to make their products cheaper by using ODMs.  ODMs are expert at mass producing electronic products cheaply by locating their factories near the source of needed commodities and transportation hubs and hiring low cost labor.  ODMs are also used by brand name companies to have their products made in low cost countries who have laws that are not favorable to foreign ownership of property.

20.     Foxconn is a colossus with dominant market power as a manufacturer of cell phones, tablets, computers, digital cameras and digital televisions, to name but a few products that it makes, sometimes being the sole source for its customers.  For example, on information and belief, Foxconn manufactures one hundred percent (100%) of all iPhone5 products and over ninety percent (90 %) of all iPad products for Apple.  On information and belief, Foxconn manufactures computers for numerous brand names, including HP, Dell, IBM, Apple, Acer and Sony.  On information and belief, Foxconn manufactures forty percent (40%) of the MacBook and twenty percent (20%) of the iMac.  On information and belief, Foxconn also manufactures the e-readers for Amazon and LCD TVs for Sony and Sharp.  Almost all of the foregoing products made by Foxconn have at least one USB connector.  On information and belief, as part of its business, Foxconn Kunshan incorporates USB 3.0 connectors made into circuit boards

8

("motherboards"), which are incorporated into the product manufactured by one or more of the Defendants.

21.     On information and belief, Foxconn Kunshan together with other Foxconn companies located in China are one of that country's largest exporters. Foxconn's sudden rise to power was accomplished in the no-holds-barred and virtually unregulated capitalist culture of Asia. Foxconn is infamous for its sharp and unscrupulous business practices in its quest to squeeze a profit without regard to legal or ethical norms, including the harsh exploitation of its workers at its factories in China. The print and electronic media have reported on the suicides at Foxconn plants, including even threatened mass suicides, because of exploitation and inhumane working conditions. See, e.g., http://www.telegraph.co.uk/news/ worldnews/asia/china/9006988/ Mass-suicide-protest-at-Apple-manufacturer-Foxconn-factory.html. Foxconn has continued its sharp and unscrupulous business practices in the standards setting arena by abusing the standards setting process to gain monopoly power and by conspiring to restrain trade, among other things, as further described below.

22.     Intel Corporation ("Intel") was instrumental in organizing the technical standard for USB 3.0 allowing different manufactures to produce connectors and devices that could seamlessly communicate over a USB 3.0 connector. Intel was the lead promoter who formed the USB 3.0 Promoter Group composed of manufacturers whose charter was to form the technical standard for USB 3.0 connectors and cable assemblies. Lotes signed the Contributors Agreement on December 11, 2007. A true and correct copy of the Contributors Agreement signed by Lotes and Intel is provided at Exhibit A.

23.     On information and belief, the USB 3.0 Promoter Group announced on November 17, 2008, that the technical specification for USB 3.0 was completed and formally transitioned to

the USB-IF, the managing standards body for USB specifications.

24.     On information and belief, in 2007 or 2008, Defendants and Intel executed the same USB 3.0 Contributors Agreement signed by Lotes and Intel. On information and belief, Defendants are bound by Section 3.4 of the Contributors Agreement entitled "Limited Patent Licensing Obligations in Contributions," which states as follows:

> Effective upon the Promoters adoption of the Final Specification, for any Contributions made by Contributor, Contributor hereby agrees that upon request, it will, and will cause its Affiliates to, grant to any Promoter or Adopter, and their respective Affiliates, (collectively, "Licensee") a non-exclusive, world-wide license under any Necessary Claim of a patent or patent application reading on such Contributions, to make, have made, use, import, sell, offer to sell, and otherwise dispose of Compliant Portions; provided that such license need not to extend to any part or function of a product in which a Compliant Portion is incorporated that is not part of the Compliant Portion. Such license shall be granted on a royalty-free basis and under otherwise reasonable and non-discriminatory ("RAND-Zero") terms, provide that such license grant may be conditioned upon, including but not limited to, the Licensee's grant of a reciprocal license binding Licensee.

(Emphasis in original).

25.     Defendants are "Contributors," and Lotes is an "Adopter" and fellow Contributor under the Contributors Agreement.

26.     Furthermore, Defendants agreed to be bound by Section 2 of the Contributors Agreement entitled "Compliance with Antitrust Laws" which states, in part, as follows:

> Contributor and Promoters are committed to fostering open competition in the development of products and services based on the Final Specification. Contributor and the Promoters understand that in certain lines of business they are or may be direct competitors and that it is imperative that they and their representatives act in a manner that which does not violate any state, federal or international antitrust laws and regulations.

27.     In March 2011, Lotes and Hon Hai signed a non-disclosure agreement in preparation for discussions regarding licensing patents related to USB 3.0 connectors pursuant to the Contributors agreement.

28.     On April 20, 2011, Mr. Gregory L. Lippetz of the Jones Day law firm emailed

Mr. Eric Young, in-house counsel for Lotes, stating that his firm represented "Hon Hai in

connection with USB 3.0 licensing activities." Mr. Lippetz stated that Jones Day was "currently

developing licensing agreements for Hon Hai's USB 3.0 patents and will be in touch with you in

the near future to discuss you interest in licensing these patents." After this email, Lotes never

heard from Jones Day or Hon Hai regarding licensing of Hon Hai's USB 3.0 patents. A true and

correct copy of the email dated April 20, 2011, from Mr. Lippetz to Mr. Young is provided at

Exhibit B.

29.     In a letter dated February 10, 2012, using Hon Hai letterhead, Mr. Ben Sley, Sr.

In-House Counsel and a U.S. Patent Attorney for Foxconn Electronics, Inc., sent a letter to Mr.

Jeffrey L. Ravencraft, President and COO of USB-IF. The letter states, in part, as follows:

> Hon Hai Precision Industry Co., Ltd. and the Foxconn Technology Group (collectively,
> "Foxconn") are pleased to be active contributors of the USB 3.0 project and early signers
> of the USB Contributors Agreement. Foxconn unequivocally affirms that it will make
> the "Necessary Claims" used in connection with all USB 3.0 "Compliant Portions" – i.e.,
> that IP that is necessary to practice the USB 3.0 specification   available to other USB
> 3.0 contributors and adopters under RAND-Zero terms pursuant to the USB 3.0
> Contributors Agreement.

The letter above is an admission that the Defendants have executed the USB Contributors

agreement and are bound by its terms. A true and correct copy of the letter dated February 10,

2012, from Mr. Sley to USB-IF is provided at Exhibit C.

## DEFENDANTS ABUSE THE STANDARDS SETTING ORGANIZATION BY RENEGING ON THEIR EXPRESS AGREEMENTS AND PROMISES

30.     Lotes has invested millions of dollars in research & development and has built

two factories in China for its employees to make USB 3.0 standards compliant connectors,

among other things, for export to the United States and other places. Lotes has made contractual

arrangements with distributors and customers to take delivery of its USB 3.0 connector products.

Lotes did these things because it relied on the promises and assurances made by those

participating in the USB-IF standards group.  Specifically, Lotes has relied upon the Contributors

Agreement executed by Hon Hai and Foxconn that obligated the Defendants to license on

RAND-Zero terms all the patents necessary to make, use and sell USB 3.0 connectors ("the

Necessary Patents").  Furthermore, Hon Hai's attorneys at Jones Day made statements in April

2011 misleading Lotes into believing that Hon Hai was ready to license its USB 3.0 patents.

Finally, Lotes has relied upon the February 10, 2012, letter to USB-IF where Defendants

"unequivocally affirm[]" that they would license their patents on RAND-Zero terms pursuant to

the Contributors Agreement to "other USB 3.0 contributors and adopters."

31.    Notwithstanding binding contractual obligations to provide a world-wide license

to its USB 3.0 patents on RAND-Zero terms and their unequivocal affirmation to USB-IF

promising to abide by the Contributors Agreement, Defendants proceeded to violate their

agreements and promises to the industry, undermining the safeguards that SSOs put in place to

guard against abuse.

32.    On information and belief, Hon Hai and Foxconn have contacted the customers

and distributors of Lotes to allege that they have the sole patent rights on USB 3.0 connectors

and would sue them if they did not buy from Foxconn.  Furthermore, Hon Hai and Foxconn have

refused to license on RAND-Zero terms other manufacturers of USB 3.0 connectors and have

sent out warning letters threatening these manufacturers with patent litigation.  Fearful of

retribution from Hon Hai and Foxconn, these manufacturers, customers and distributors prefer to

remain anonymous.  It was not a coincidence that articles also started appearing in the Taiwan

trade press to announce that Foxconn owned the intellectual property in USB 3.0 connector

technology.  For example, one article in the Commercial Times headlined that "USB 3.0

Connector Patents:  Foxconn Takes All, First to obtain relevant patents, initially expected to

monopolize market, approximately 2.3 billion devices estimated to use USB 3.0 in 2015," where the source information for the article was attributed to Foxconn.   A true and correct copy of the Commercial Times article dated February 23, 2010, along with the English translation is provided at Exhibits D and D-1.

33.     In breach of their contract obligations and public affirmations, Defendants conspired to have Foxconn Kunshan initiate patent enforcement proceedings in China against Lotes under Article 60 of the Chinese Patent Law.  These patent enforcement proceedings were filed on July 9, 2012, in the JiangSu Intellectual Property Office, a department of the State Intellectual Property Office of the P.R.C. ("SIPO") located in the JiangSu province.  Foxconn Kunshan filed papers seeking to enjoin Lotes from making, and its customers from selling all products allegedly infringed by two patents with claims that read on the UBS 3.0 standard.

34.     Foxconn Kunshan is seeking to enjoin Lotes SuZhou, a Lotes subsidiary located in the JiangSu province of Eastern China, from making USB 3.0 connectors.  Foxconn Kunshan asserted Chinese Patent Nos. 200820138608.0 ("the '608.0 patent") and 200810128623.1 ("the 623.1 patent") against Lotes SuZhou (collectively, "the Asserted Patents").  In an orchestrated move in conspiracy with its co-Defendants, these enforcement actions were brought by Foxconn Kunshan in bad faith and for malicious purposes.  The Defendants knew or should have known that the Asserted Patents have claims that read directly on the USB 3.0 standard.  Therefore, Lotes either has a license to the Asserted Patents or, in the alternative, has an irrevocable right to a RAND-Zero license, as expressly granted by the Defendants when they agreed to be bound by the Contributors Agreement.  On information and belief, the joint owners of the Asserted Patents are Foxconn Kunshan and Hon Hai.  True and correct copies of the Asserted Patents, along with their respective – but unasserted – counterparts filed in the U.S. Patent and Trademark Office

("USPTO"), are provided in Exhibits E, E-1, F and F-1.

35.     Concurrently, Foxconn Kunshan has also initiated patent enforcement proceedings on the Asserted Patents against Lotes GuangZhou, a Lotes subsidiary located in the GuangDong province of Southern China, and against a retail store to enjoin them from making and selling, respectively, USB 3.0 connectors.  The retail store sells printed circuit boards with USB 3.0 connectors made by Lotes.  True and correct copies with English translations of the Requests for Disposition of Patent Infringement Dispute filed by Foxconn Kunshan in the JiangSu Intellectual Property Office are provided in Exhibits G, G-1, H, H-1, I, I-1, J, and J-1.

36.     All four Requests for Disposition of Patent Infringement Dispute filed by Foxconn KunShan similarly specify the same USB 3.0 connectors be enjoined and destroyed, as follows:

> That the Requestee [i.e., Lotes] be ordered immediately to stop production and sale of USB 3.0 electrical connector products (model nos. ABA-USB-079-XXX, ABA-USB-036-XXX, etc.) which are infringing the requestor's invention patent  ZL 2008201386080 [or ZL 2008101286231], that it destroy the infringing products in stock, the special die and other special tools used specifically to manufacture the aforesaid infringing products, the infringing product packaging and instructions, promotional materials for related products, and product drawings and catalogues.

The retailor is directed to stop the sale of all products containing the aforementioned connectors.  The breadth of the enforcement action indicates that all USB 3.0 connectors are threatened to be enjoined by Foxconn KunShan.  On information and belief, the JiangSu Intellectual Property Office has the power to shut down the production lines of Lotes and stopping all products coming into the United States.  On information and belief, Foxconn KunShan can withdraw this enforcement action at any time.  On information and belief, the JiangSu Intellectual Property Office has advised Foxconn KunShan to withdraw the Requests for Disposition of Patent Infringement Dispute, and Foxconn KunShan has refused.

37.     If the Lotes factories are enjoined from making USB 3.0 connector products, numerous electronics companies would lose their supply of USB 3.0 connector products. Lotes has contracted to supply its USB 3.0 connector products to various manufacturers of motherboards who will incorporate the USB 3.0 connectors made my Lotes onto their products. These motherboards find their way to ODMs who manufacture finished goods for brands such as Asus, Gigabyte, Acer, Pegatron, Toshiba, Lenovo, Dell and HP, which are shipped to the United States for distribution. In short, Foxconn and Lotes are competitors in the USB 3.0 connector market. The loss of Lotes in the USB 3.0 connector market would damage competition and lead to more expensive goods in the United States.

## LOTES HAS ANTITRUST STANDING BECAUSE DEFENDANTS HAVE ENGAGED IN CONDUCT THAT HAS INJURED AND WILL CONTINUE TO INJURE COMPETITION AND LOTES IN THE USB 3.0 CONNECTOR MARKET

38.     Hon Hai and Foxconn are doing exactly the things that the USB-IF standards body was set-up to prevent: illegally conspiring to keep competing manufacturers, such as Lotes, out of the USB 3.0 connector market. Lotes SuZhou and Lotes GuangZhou are the only factories making USB 3.0 connectors for Lotes, and the USB 3.0 connectors made at these two factories are put into notebook computers, motherboards and other devices predominantly for export to the United States, the world's biggest market for computer products.

39.     The initiation of patent enforcement proceedings against Lotes SuZhou and Lotes GuangZhou – along with attendant threat of an injunction – has resulted in confusion, uncertainty, and threatens to lead to a significant decrease in competition in the USB 3.0 connector market in the United States by driving business away from Lotes into the arms of Foxconn. Should an injunction issue preventing Lotes from manufacturing in China, a significant market share in the USB 3.0 connector market would go to Foxconn, effectively

15

eliminating Lotes as a major competitor in the USB 3.0 connector market, upsetting the supply chain and adversely affecting consumers by raising prices. But for the breaches of the Contributors Agreement, violations of the USB-IF SSO policies and outright deception of the competition by Defendants, Lotes and competition in the 3.0 connector market would not be suffering. For example, Lotes sells its UBS 3.0 connectors to Quanta Computer, Inc. ("Quanta") and Compal Electronics, Inc. ("Compal") who build products for Dell Computer. Similarly, Lotes sells its USB 3.0 connectors to Quanta, Compal, and Inventec Corp. ("Inventec"), who build products for Hewlett-Packard. Quanta, Compal and Inventec are ODMs that compete with Foxconn. Furthermore, Defendants have deceived USB-IF and put Lotes under a cloud of litigation with its patent enforcement actions which has the effect of interfering with Lotes' negotiations with potential customers. Defendants are well-aware of this supply chain and are actively and purposely seeking to disrupt the contracts Lotes has with these competitor ODMs and to check-off the flow of goods into the United States.

40.     Now that the entire industry has made massive investments and contractual commitments in the USB 3.0 connector standard, Defendants are unfairly taking advantage of the prohibitive switching costs that would result in going to another standard. By changing the rules in the middle of the game and violating the antitrust laws, Defendants hope to recoup an inequitable windfall by threatening or actually instituting litigation on IPR that had agreed-upon terms of RAND-Zero royalty.

41.     The relevant market in which to assess the antitrust conduct of Defendants is the USB 3.0 connector market for consumer electronics. Lotes is allegedly infringing the Asserted Patents by making products that infringe patent claims that implicate features found in the USB 3.0 specification. Defendants are wrongfully using their foreign patents to raise prices and

exclude competition in the USB 3.0 connector market in the United States.  Defendants acquired this power as a result of misconduct in connection with the standards-setting process, including failure to license its patents on RAND-Zero terms to competitors like Lotes.

42.     Barriers to entry into the USB 3.0 connector market are high because, among other reasons, the post-standardization lock-in effect means that other connector technologies are no longer viable substitutes for the technologies in the standard specifies.  As any typical U.S. buyer of consumer electronics already knows, computer makers all over the world have converged on the USB standard as almost the exclusive means for connecting peripheral devices with personal computers, laptops, tablets and other computing products.  The migration from USB 2.0 to USB 3.0 is almost complete with most computers having USB 3.0 connectors as the interface of choice.  By way of example, the Hewlett-Packard Pavilion dv6-7043cl notebook computer, currently available at Costco, has three USB 3.0 ports and one USB 2.0 port.

43.     As described in Paragraphs 31 to 37, Foxconn holds monopoly power in the USB 3.0 connector market because the patents owned by this huge conglomerate are being used – in breach of its commitments – to make it the only source of USB 3.0 connectors.  In the alternative, even if one or more of the Asserted Patents were ultimately determined not to be necessary for making USB 3.0 connectors (or were determined to be invalid or unenforceable), Foxconn would still hold a monopoly power position in the USB 3.0 connector market until a determination on the infringement, invalidity or unenforceability were established conclusively.  Outside of China, Hon Hai's U.S. patents hang like a sword of Damocles over all USB 3.0 connector manufacturers who do not yield to the Defendants.  Merely by asserting or threatening to assert its patents, Defendants are able to extract royalties or other licensing terms greatly exceeding what they could have obtained before USB-IF standardized the connector technology

that Defendants are asserting is covered by their patents.  Defendants enjoy hold-up power

because, unless Defendants comply with the Contributors Agreement, USB 3.0 connector

manufacturers, distributors and retailers in China must risk possible injunction against the sale of

USB 3.0 connectors or any device incorporating a connector not made by the Defendants.  In the

United States, an alleged infringer of Defendants' patents, who implements the USB 3.0 standard

and uses a competitor's connector, even risks treble damages for willful infringement and the

considerable expense of a lengthy challenge to the alleged infringement, validity and

enforceability of Hon Hai's patents.  Furthermore, because manufacturing occurs in China for

almost all computer products, including USB 3.0 connectors, China is a "choke point" where

patent assertions can halt exports to the United States and world-wide, and this is exactly what

Defendants are trying to achieve.

### SPECIFIC ANTITRUST VIOLATIONS BY HON HAI AND FOXCONN

44.  The foregoing conduct by the Defendants has caused and threatens to cause harm

to competition in the United States.  These antitrust effects include each of the following:

(a) By first promising to license world-wide on RAND-Zero terms and then inducing competitors to manufacture product by its public statements that it would abide by its agreements to license its USB 3.0 connector patents on RAND-Zero terms, Hon Hai and Foxconn have made damaging and false commitments to the USB-IF.  Before standardization, each functionality in a USB 3.0 connector that is purportedly covered by one of Defendants' patents competed with all available technical alternatives on a level playing field; however, following standardization, alternative technologies to perform functions necessary to practice the standard are no longer viable.

(b) Defendants' unlawful conduct has increased prices and stifled competition in the USB 3.0 connector market.  Manufacturers, like Lotes, ODMs, distributors, retailers and others have been harmed by the conduct of Defendants by being forced to pay (or face demands for, on threat of injunction and marketplace disparagement) higher prices as a result of Defendants' illegal conduct.  These higher prices are passed along to United States consumers who end-up purchasing the final and more expensive end product.

(c) The conduct of Defendants have increased costs and, unless enjoined, will continue to substantially increase costs associated with the manufacture and sale of downstream

computer products and peripheral products that are compliant with USB 3.0 connector standard, potentially exclude rivals from the manufacture and sales of such devices, and chill innovation and quality competition for products that comply with the USB 3.0 standard.

(d) The conduct of Defendants also threaten to chill innovation and quality competition for products that comply with the USB 3.0 connector standard. If Defendants are left unchecked, innovators will no longer be able to invest in and bring to market products that comply with the USB 3.0 standard with confidence that holders of patents necessary to the SSO will not be able to unreasonably exploit their position by enjoining competitors from making competing products.

45. Such harm will continue unless and until the Court issues appropriate relief as requested below.

## FIRST COUNT
### (Breach of Contract – RAND-Zero and Other Standard-Related Misconduct)
### (Against All Defendants)

46. Lotes incorporates and realleges Paragraphs 1 through 45 of this Complaint.

47. As set forth above, by committing to license the necessary patents to adopters of the USB 3.0 standard on RAND-Zero terms and agreeing to comply with the antitrust laws, Defendants entered into express contractual commitments with USB-IF and unequivocally affirmed that they would be bound by the Contributors Agreement. Relying on these commitments are members, manufacturers, designers and sellers of products that implement USB 3.0 specification.

48. Each party implementing the USB 3.0 standard – including Lotes – is a third party beneficiary and obtains the benefits of Defendants' contractual commitments and promises. It was material, indeed critical, to the contractual commitments of Lotes that Defendants agreed to convey world-wide RAND-Zero licenses to all adopters the USB 3.0 standard – including Lotes.

49. Defendants breached their commitments and obligations by conspiring with Defendant Foxconn Kunshan to claim infringement in China and seeking to enjoin Lotes

(specifically, Lotes SuZhou and Lotes GuangZhou) from practicing the USB 3.0 connector standard. This conspiracy was carried out with bad intent and with the knowledge that the alleged inventions claimed in the Asserted Patents are licensed or promised to be licensed under RAND-Zero terms. Lotes has a world-wide right to practice any valid patent owned by the Defendants - in China or anywhere else – with claims that read on the USB 3.0 standard, or the alternative. Lotes has the right to a RAND-Zero license to these patents by virtue of the RAND-Zero commitments made by the Defendants. Defendants have acted unreasonably and unfairly towards and discriminating against Lotes because Lotes is a competitive threat to the Defendants.

50.     As a result of these multiple contractual breaches, Lotes has been injured, including in its business and property. Lotes has been forced to expend resources resolving this licensing dispute, including defending itself before administrative tribunals in China in actions brought by Foxconn Kunshan which threaten to enjoin the manufacture and sale of its products. Lotes has suffered or faces the threat of loss of profits, loss of customers and potential customers, loss of goodwill, uncertainty in business planning, and uncertainty among customers and potential customers.

## SECOND COUNT
### (Promissory Estoppel)
### (Against All Defendants)

51.     Lotes incorporates and realleges Paragraphs 1 through 50 of this Complaint.

52.     Defendants have made clear and definite promises to potential licensees through their commitments to USB-IF that they would license all necessary patents on RAND-Zero terms.

53.     The intended purpose of Defendants' promises was to induce reliance. Defendants knew or should have reasonably expected that their promises would induce

manufacturers of USB 3.0 connectors, like Lotes, to develop products compliant with the USB 3.0 connector standard.

54.     Lotes developed and marketed its products in reliance on Defendants' promises, as described above, including making its products compliant with the USB 3.0 connector standard.

55.     Defendants are estopped from reneging on these promises to USB-IF, its members, designers, and sellers of products implementing the USB 3.0 standard, under the doctrine of promissory estoppel.

56.     Lotes has been harmed as a result of its reasonable reliance on Defendants' promises. Lotes has been forced to expend resources resolving this licensing dispute, including defending itself and its customer in China for patent infringement and efforts to enjoin its products notwithstanding its license to the Asserted Patents, or in the alternative its right to a RAND-Zero license to the Asserted Patents, or in the alternative its right to a RAND-Zero license to the Asserted Patents by virtue of Defendants' RAND-Zero commitments and Lotes' acceptance thereof, and is threatened by the loss of profits, loss of customers and potential customers, loss of goodwill, uncertainty in business planning, and uncertainty among customers and potential customers.

57.     Lotes invokes this Court's equitable powers to address this cause of action. Lotes requests that the Court find that the standards-related misconduct recited herein as grounds for enjoining the Defendants from asserting world-wide, including China, all patents owned by one or more Defendants that purport to have claims that read on any part of the USB 3.0 standard.

## THIRD COUNT
### (Waiver)
### (Against All Defendants)

58.     Lotes incorporates and realleges Paragraphs 1 through 57 of this Complaint.

59.     Defendants have executed the Contributors Agreement and expressly and unequivocally affirmed in at least one public letter to USB-IF that they would license on RAND-Zero terms the patents necessary to practice the USB 3.0 standard.

60.     Through these statements, Defendants have voluntarily and intentionally waived all rights to compensation for any patents covering the USB 3.0 standard for anything other than zero royalty.

61.     Lotes is suffering and will continue to suffer irreparable injury by reason of the acts and conduct of Defendants as alleged above until and unless the Court enjoins Defendants from asserting world-wide, including China, all patents owned by one or more Defendants with claims purporting to cover the USB 3.0 standard.

## FOURTH COUNT
### (Tortious Interference with Contracts and Prospective Economic Relations)
### (Against All Defendants)

62.     Lotes incorporates and realleges Paragraphs 1 through 61 of this Complaint.

63.     By their actions, Defendants have knowingly interfered with the performance of numerous existing contracts between Lotes and its customers – including, but not limited to, Compal, Quanta and Inventec – in the manufacture and sale of USB 3.0 connectors, by filing patent enforcement actions in China, knowing that the Asserted Patents either were validly licensed or that Defendants had an obligation to license the Asserted Patents to Lotes.

64.     By their actions, Defendants have deceived USB-IF and knowingly prevented the making of contracts by Lotes with its prospective customers for the manufacture and sale of USB

3.0 connectors, by putting Lotes under a cloud of litigation in the filing of patent enforcement actions in China, knowing that the Asserted Patents either were validly licensed or that Defendants had an obligation to license the Asserted Patents to Lotes.

65.     Lotes has suffered and will continue to suffer damages in an undetermined amount to be proven at trial and invokes the Court's power to order Defendants to compensate Lotes for its damages.

## FIFTH COUNT
### (Declaratory Judgment that Lotes is Licensed
### to Defendants' Necessary Patents)
### (Against All Defendants)

66.     Lotes incorporates and realleges Paragraphs 1 through 65 of this Complaint.

67.     There is a dispute between the parties concerning whether, to the extent that any of the alleged inventions described in and allegedly covered by valid patents owned by one or more Defendants and necessary to practice the USB 3.0 standard ("the Necessary Patents") are used, manufactured, or sold by or for Lotes, its suppliers, and/or its customers, Lotes is licensed or, in the alternative, has an irrevocable right to a RAND-Zero license to the Necessary Patents by virtue of Defendants' RAND-Zero commitments.

68.     The dispute is of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

69.     Lotes is entitled to a declaratory judgment that, to the extent any of the alleged inventions claimed in the Necessary Patents are used, manufactured, or sold by or for Lotes, its suppliers, and/or its customers, Lotes is licensed to Defendants' Necessary Patents by virtue of Defendants' RAND-Zero commitments or, in the alternative, Lotes has an irrevocable right to be licensed on RAND-Zero terms under those patents.

## SIXTH COUNT
### (Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1)
### (Against All Defendants)

70.     Lotes incorporates and realleges Paragraphs 1 through 69 of this Complaint.

71.     Hon Hai and Foxconn have combined and conspired to restrain trade and prevent competition in the USB 3.0 connector market in violation of § 1 of the Sherman Act (15 U.S.C. § 1).

72.     In furtherance of said combination and conspiracy, Hon Hai and Foxconn have made false commitments to the USB-IF standards body promising to license any Necessary Patents on RAND-Zero terms, and by reneging on its RAND-Zero contractual obligations.  Hon Hai and Foxconn have undertaken this cumulative course of conduct with the intent to restrain trade and prevent competition in the USB 3.0 connector market

73.     Had Hon Hai and Foxconn properly disclosed their true intentions, to wit, that the parties implementing the standard were not licensed and should be enjoined from selling USB 3.0 standard compliant products or pay other than RAND-Zero terms, USB IF would have decided to standardize on an alternative technology to perform the relevant functions. Alternatively, USB-IF would have continued to leave the relevant functions out of the standard, in which case implementers would have been free to choose various competing technologies to perform the patented functions, and USB-IF would have been free to continue to evaluate competing alternative connector standards for future iterations of the USB 2.0 standard.

74.     The deceptions and fraud of Hon Hai and Foxconn have resulted in incorporation of their patents into the USB 3.0 standard, over which the Defendants claim world-wide patent rights.  Hon Hai and Foxconn have, therefore, unlawfully excluded competing technologies from the USB 3.0 standard and unlawfully acquired monopoly power in the USB 3.0 connector market

in the United States by choking-off supply in China, where the relevant factories of its competitors – including Lotes – are located, and from where these USB 3.0 connectors are incorporated into numerous computer products and peripheral devices for export into the United States.

75.     This conspiracy was undertaken by the Defendants with the express purpose and intent of restraining competition in the USB 3.0 connector market and excluding Lotes as a market competitor.

76.     The conduct by the Defendants substantially and adversely impacts competition in interstate commerce in the USB 3.0 connector market.  No valid business reason exists for the Defendants' actions.  Unless enjoined by this Court, the conduct by the Defendants will result in higher prices and elimination of choice in the USB 3.0 connector market.

77.     As a direct and proximate result of Defendants' illegal acts, Lotes has antitrust standing.  Lotes has suffered injury to its business and property, in an amount currently unascertained, and is threatened by the imminent loss of customers and potential customers, and loss of goodwill.  Because of the unlawful acts of the Defendants, Lotes suffers antitrust injury because its factories in China for making USB 3.0 connectors are threatened to be closed from making these products.  Because Defendants have deceived the SSO (i.e., USB-IF) and wrongfully-exercised their market power, Lotes has been forced to expend significant resources, including filing this lawsuit and defending itself abroad to keep its factories open so that product can flow into the United States.  Unless enjoined, the conduct by the Defendants is likely to persist and will continue to cause irreparable loss and damage to Lotes, for which Lotes has no adequate remedy at law.

78.     Defendants' actions have caused and will continue to cause significant harm to

25

competition in the USB 3.0 connector market.  Unless restrained by the Court, Defendants' antitrust conduct will continue to harm competition in the relevant market by restricting output and raising prices on computer devices and peripherals communicating over USB 3.0 connectors. Lotes is also requesting that the Court award it compensatory damages for an amount to be determined at trial.

## SEVENTH COUNT
### (Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2)
### (Against All Defendants)

79.    Lotes incorporates and realleges Paragraphs 1 through 78 of this Complaint.

80.    Hon Hai and Foxconn have combined and conspired with the specific intent to monopolize and have attempted to monopolize the USB 3.0 connector market in violation of § 2 of the Sherman Act (15 U.S.C. § 2).

81.    In furtherance of said combination and conspiracy, Hon Hai and Foxconn have made false commitments to the USB-IF standards body promising to license IPR on RAND-Zero, and by reneging on its RAND-Zero contractual obligations.  Defendants have undertaken this course of conduct with the intent to monopolize the USB 3.0 connector market.

82.    Had Hon Hai and Foxconn properly disclosed their true intentions, to wit, that the parties implementing the standard were not licensed and should be enjoined from selling USB 3.0 standard compliant products or pay other than RAND-Zero terms, USB-IF would have decided to standardize on an alternative technology to perform the relevant functions. Alternatively, USB-IF would have continued to leave the relevant functions out of the standard, in which case implementers would have been free to choose various competing technologies to perform the patented functions, and USB-IF would have been free to continue to evaluate competing alternative connector standards for future iterations of the USB 2.0 standard.

83. The deceptions and fraud by Hon Hai and Foxconn have resulted in incorporation into the USB 3.0 standard of the technology over which Defendants now claim world-wide patent rights. Defendants have, therefore, unlawfully excluded competing technologies from the USB 3.0 standard and unlawfully acquired monopoly power in the USB 3.0 connector market in the United States by attempting to choke-off supply in China, where the relevant factories of its competitors   including Lotes – are located, and from where these USB 3.0 connectors are incorporated into numerous computer products and peripheral devices for export into the United States.

84. The conspiracy by the Defendants was undertaken with the express purpose and intent of monopolizing the USB 3.0 connector market and excluding Lotes as a market competitor.

85. The Defendants' conduct substantially and adversely impacts competition in interstate commerce in the USB 3.0 connector market. No valid business reason exists for the Defendants' actions. Unless enjoined by this Court, the conduct by the Defendants will result in higher prices and elimination of choice in the USB 3.0 connector market.

86. Defendants manufacture a variety of products for Apple, Dell, Hewlett-Packard, Motorola, Nintendo, Sony and Nokia, to name a few. Defendants have the opportunity to place their USB 3.0 connectors in the products of the aforementioned companies, and concurrently, has taken unlawful steps to gather more market share from its competitors, such as Lotes. As such, Defendants have a dangerous probability of obtaining monopoly power in the USB 3.0 connector market in the United States and abroad.

87. As a direct and proximate result of the attempted monopolization by the Defendants, Lotes has antitrust standing. Lotes has suffered injury to its business and property,

in an amount currently unascertained, and is threatened by the imminent loss of customers and potential customers, and loss of goodwill. Because of the unlawful acts of the Defendants, Lotes suffers antitrust injury because its factories in China for making USB 3.0 connectors now face an imminent threat of being prohibited from making these products. Because Defendants have abused their wrongfully-obtained market power, Lotes has been forced to expend significant resources, including filing this lawsuit and defending itself abroad to keep its factories open so that product can flow into the United States. Unless enjoined, Defendants' conduct is likely to persist and will continue to cause irreparable loss and damage to Lotes, for which Lotes has no adequate remedy at law.

88.     Defendants' actions have caused and will continue to cause significant harm to competition in the USB 3.0 connector market. Unless restrained by the Court, the antitrust conduct of the Defendants will continue to harm competition in the relevant market by restricting output and raising prices on computer devices and peripherals communicating over USB 3.0 connectors. Lotes is also requesting that the Court award it compensatory damages for an amount to be determined at trial.

## PRAYER FOR RELIEF

Wherefore, Lotes respectfully requests that judgment be entered in its favor and against Defendants, Hon Hai, Foxconn International CI, Foxconn International USA, Foxconn Electronics and Foxconn Kunshan, and that Lotes be granted the following relief:

A.     Adjudge and decree that Defendants are liable for breach of contract;

B.     Adjudge and decree that Defendants are liable for promissory estoppel;

C.     Adjudge and decree that Defendants are liable for tortious interference with contracts and prospective economic relations;

D.      Adjudge and decree that Defendants have violated Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2;

E.      Enter judgment awarding Lotes for the amount of damages plus interest that Lotes proves at trial;

F.      Enter judgment awarding Lotes its expenses, costs, and attorneys fees in accordance with Rule 54(d) of the Federal Rules of Civil Procedure;

G.      Enter judgment for trebling of compensatory damages under the Sixth and Seventh Counts pursuant to 15 U.S.C. § 15;

H.      Enter judgment awarding Lotes punitive damages;

I.      Enjoin Defendants and their officers, agents, servants, employees, and all those acting in privity or concert with them from engaging in any further unlawful and exclusionary acts as herein alleged, including, but not limited to, an injunction stopping world-wide enforcement against Lotes of all patents owned by Defendants with claims that read on the USB 3.0 standard;

J.      Decree that all patents owned by one or more Defendants and necessary to practice the USB 3.0 standard are not to be asserted by virtue of standards-related misconduct in its relations with the USB-IF and the members of that body, including Lotes;

K.      Decree that, to the extent any valid patents owned by one or more Defendants and necessary to practice the USB 3.0 standard are used, manufactured, or sold by Lotes, its suppliers, distributors and/or customers, Lotes is licensed by virtue of Defendants' RAND-Zero commitments or, in the alternative, that Lotes has an

irrevocable right to be licensed world-wide on RAND-Zero terms under those patents;

L.      Decree that Lotes is entitled to license on RAND-Zero terms from Defendants any and all valid patents owned by one or more Defendants and identified to the USB-IF in relations to the USB 3.0 specification;

M.      Decree that Defendants have through their statements and actions waived their rights to enforce against Lotes any and all valid patents, filed anywhere in the world, with claims that read on the USB 3.0 standard.

N.      Decree that this case is an exceptional case and award Lotes its reasonable attorneys' fees, costs and expenses pursuant to 35 U.S.C. § 285 and 15 U.S.C. § 15; and

O.      Granting such other and further relief as it may deem just and proper.

//

//

//

//

//

//

//

//

//

//

//

## DEMAND FOR JURY TRIAL

Plaintiff Lotes Co., Ltd. demands a trial by jury.

Respectfully Submitted,

Dated:  October 4, 2012

Lewis E. Hudnell, III (LH 9718)
Colvin Hudnell LLP
375 Park Avenue
Suite 2607
New York, New York 10152
Telephone: 347.855.4772
Facsimile: 347.772.3034
lewis@colvinhudnell.com

Nicolas S. Gikkas
The Gikkas Law Firm
P.O. Box 2247
Saratoga, California 95070-0247
Telephone: 408.868.7726
Facsimile:  408.877.1516
nsg@gikkaslaw.com


Attorneys for Plaintiff
LOTES CO., LTD.