UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x

LOTES CO., LTD.,                                    2:12-CV-7465 (SAS)

                 Plaintiff

         v.                                         **JURY TRIAL DEMANDED**

HON HAI PRECISION INDUSTRY CO., LTD.;               **FIRST AMENDED COMPLAINT**
FOXCONN INTERNATIONAL HOLDINGS LTD.;
FOXCONN INTERNATIONAL, INC.; FOXCONN
ELECTRONICS, INC.; and FOXCONN (KUNSHAN)
COMPUTER CONNECTOR CO., LTD.

                 Defendants.
-------------------------------------------------------------x

Under the Court's Order dated December 10, 2102 (Dkt. No. 22), Lotes Co., Ltd.

("Lotes" or "Plaintiff") files this First Amended Complaint against Defendants Hon Hai

Precision Industry Co., Ltd.; Foxconn International Holdings Ltd.; Foxconn International, Inc.;

Foxconn Electronics, Inc.; and Foxconn (Kunshan) Computer Connector Co., Ltd. (collectively,

"Defendants").  Lotes complains and alleges as follows:

<u>**THE PARTIES**</u>

1.     Lotes is a Taiwan corporation with a place of business at No. 15, Wusyun St.,

Anle District, Keelung City, 20446 Taiwan, R.O.C.  Lotes is traded on the Taiwan Stock

Exchange Corporation (TSEC) under the code 3533.

2.     Defendant Hon Hai Precision Industry Co., Ltd. is a Taiwan corporation with a

place of business at 2, Tzu Yu Street, Tu-cheng District, New Taipei City, 23678 Taiwan, R.O.C.

("Hon Hai"). On information and belief, Hon Hai is a giant multinational electronics

manufacturer that is one of the world's largest makers of electronic components, including

connectors and cable assemblies for use in PCs, such as Universal Serial Bus ("USB") 3.0 connectors.  On information and belief, as of April 2012, Hon Hai had a market capitalization of approximately $37.8 billion, annual sales of approximately $102.74 billion (2011), and employed over one million people in its many factories in China and around the world.  On information and belief, Hon Hai is traded on the TSEC under the code 2317 and on the London Stock Exchange (LSE) under the symbol HHPD.

3.     Defendant Foxconn International Holdings Ltd. is a Cayman Islands corporation with a registered office at Scotia Centre, 4th Floor, P.O. Box 2804, George Town, Grand Cayman, Cayman Islands, with places of business located at 8/F., Peninsula Tower, 538 Castle Peak Road, Cheung Sha Wan, Kowloon, Hong Kong and 1705 Junctions Court, Suite 200, San Jose, California 95112 ("Foxconn International CI").  On information and belief, Foxconn International CI is an original design manufacturer ("ODM") providing vertically integrated manufacturing services for consumer electronics.  On information and belief, Foxconn International CI specializes in manufacturing services that include designing and manufacturing precision tools and molds, product development, and manufacturing of components, such as USB 3.0 connectors. On information and belief, by way of the Foxconn companies in China, Foxconn International CI is one of the largest exporters from China, and most of these products enter the United States through ports in California.  On information and belief, Foxconn International CI is traded on the Hong Kong stock exchange (SEHK) under the code 2038.

4.     Defendant Foxconn International, Inc. is a California corporation with a place of business at 1650 Memorex Drive, Santa Clara, California 95050 ("Foxconn International USA").  On information and belief, Foxconn International USA receives products from other Foxconn companies for distribution within the United States.

5.    Defendant Foxconn Electronics, Inc. is a California corporation with places of business located at 288 S. Mayo Avenue, City of Industry, California 91789 and 1688 Richard Avenue, Santa Clara, California 95050 ("Foxconn Electronics").  On information and belief, Foxconn Electronics provides design and development, manufacturing, assembly, and after-sales services to computer, communication, and consumer-electronics companies in the United States and internationally.  On information and belief, Foxconn Electronics manufactures circuit boards motherboards, graphic cards, chassis, coolers, and personal computers.

6.    Defendant Foxconn (Kunshan) Computer Connector Co., Ltd. is a China corporation with a principal place of business at 999 Beimen Road, Yushan Township, Kunshan, Jiang Su Province, P.R.C. ("Foxconn Kunshan").  On information and belief, Foxconn Kunshan is an ODM that builds numerous consumer electronics products and components for shipment into the United States, such as Apple's iPhone, iPod, and iPad, including USB 3.0 computer connector products. The Foxconn companies are collectively referred to as "Foxconn," although the Foxconn entities are, on information and belief, separate entities and not wholly owned subsidiaries of each other.  Discovery will reveal their precise interrelationships.

## NATURE OF THE ACTION

7.    This action arises under the antitrust laws of the United States 15 U.S.C. § 1, *et seq.* for antitrust behavior and unfair business practices stemming from the material breach by the Defendants of their contractual obligations and public promises to license their patents on USB 3.0 connectors as part of membership in the USB standards setting organization ("SSO"), and for the Defendants' abuse of their participation in the SSO.  The antitrust acts of Hon Hai were aided and abetted in a conspiracy with the knowing cooperation of Foxconn International CI, Foxconn Electronics, Foxconn International USA and Foxconn Kunshan  – or alternatively,

the Defendants acted as a single entity in an attempt to monopolize several relevant antitrust markets.  Relevant markets include those for USB 3.0 connectors suitable for integration into notebook and laptop computers (used interchangeably), into motherboards for desktops and servers, into consumer electronic devices other than computers, and, more generally, the overall market for USB 3.0 connectors. Additional causes of action are brought against Defendants for breach of contract, promissory estoppel, waiver, tortious interference with contracts and business expectancies, and declaratory relief.

## JURISDICTION

8.     The Court has subject matter jurisdiction pursuant to the Sherman Act, 15 U.S.C. §§ 1, 2, 15, 26 (antitrust), 28 U.S.C. §§ 1331, 1337 (federal question), and the Declaratory Judgment Act,  28 U.S.C. §§ 2201, 2202 (declaratory judgment), as well as supplemental jurisdiction over the related state law claims under 28 U.S.C. § 1367 (supplemental jurisdiction).

9.     This Court has personal jurisdiction over Defendants because, on information and belief, Defendants have executed the USB 3.0 Contributors Agreement ("Contributors Agreement") and the USB 3.0 Adopters Agreement ("Adopters Agreement"), in which Defendants consented to the jurisdiction of federal courts sitting in New York for all causes of action relating to the Contributors Agreement and Adopters Agreement.

10.     The Adopters Agreement has a forum selection clause in Section 5.6 that states as follows:

> The parties agree that all disputes arising in any way out of this Agreement shall be heard exclusively in, and all parties irrevocably consent to jurisdiction and venue in, the state and Federal courts of New York.

The Contributors Agreement has a similar forum selection clause, except that the jurisdiction and

4

venue is New York, New York.  Defendants have thus consented to resolve this dispute before the Federal Court sitting in the Southern District of New York.

11.    In addition, Defendants' acts have caused significant injury to Lotes in this District.  Moreover, the Defendants have minimum contacts with this forum as a result of business regularly conducted within the State of New York and the Southern District of New York which business activities derive substantial revenue from the sale of products within this District, expect their actions to have consequences within this District, and derive substantial revenue from interstate and international commerce. Indeed, Defendants' contacts within the State of New York are so substantial, systematic, and continuous that Defendants can be deemed to be "present" in the state for purposes of general personal jurisdiction.  Moreover, the allegations of this Complaint relate to USB 3.0 products that are being sold, offered for sale, and distributed in this state, making "specific" personal jurisdiction appropriate in this case under *International Shoe* and related cases.

12.    The allegations of the First Amended Complaint are appropriately litigated in this Court.  Defendants entered into a Contributor Agreement, on information and belief identical to the agreement attached as Exhibit A, which has a forum selection clause (para. 6.7), stating that "all disputes arising in any way out of this Agreement shall be heard exclusively in . . . the state and Federal courts of New York, New York." (Contributors Agreement, Exhibit A, at ¶ 6.7). On information and belief, one or more Defendants necessarily signed an agreement identical to that shown in Exhibit A, as well as other related agreements. The patent licenses contemplated and directed by the Contributors Agreement are "world-wide." (*Id.* at ¶ 3.4). In signing a Contributors Agreement, Defendants necessarily agreed that the scope of any worldwide patent license, including any license of Chinese patents, would be decided in New York.  Accordingly,

this Court has the right and obligation to resolve the scope of the license to which Lotes is entitled as an Adopter and Contributor in its own right.  Despite their corporate shell games and attempt to have it both ways (adoption of a global technical standard plus patent holdup in China), Defendants explicitly agreed to have their promises, and their breaches of any promises, analyzed and enforced *in this Court*.

## VENUE

13.    Venue is proper over Defendants within this District under 28 U.S.C. §§ 1391 (b), (c).  In addition, on information and belief, Defendants have executed the Contributors Agreement and Adopters Agreement in which Defendants agreed to submit themselves to venue in the federal courts of New York, which includes this District, for the causes of action alleged in the Complaint.  Furthermore, venue is proper because Lotes has suffered harm in this District. Moreover, Defendants derive substantial revenue from sales in this District.  Finally, as corporations, these Defendants are deemed to "reside" in any jurisdiction in which personal jurisdiction can be exercised over them, including in this Court.

## STANDING

14.    Lotes has standing to bring this action because it is a signatory to (and thus a party to) or a third party beneficiary of all relevant agreements, including Defendants' Contributors Agreement and Adopters Agreement. Several courts have considered the factual circumstance of a party's refusal to license under RAND-Zero or RAND terms patents that are related to the adoption of a technical standard and have universally found that intended licensees of those patents have standing as third party beneficiaries.  Lotes also has antitrust standing because it is a direct licensee of all patent rights necessary to practice the USB 3.0 standard, as well as a direct competitor of Defendants, whose customers and end users in the U.S. will suffer cognizable

6

antitrust injuries, including supply reductions, constrained choices, and price increases, if the Defendants' behavior persists and succeeds.

## FACTS

15.     Lotes was founded in Keelung, Taiwan in 1986 and specializes in the design and manufacture of connectors, CPU sockets, coolers, and antennas, primarily for notebook computers.  The annual sales of Lotes were approximately $255 million for 2011.  As the name suggestions, a "connector" is typically a means of connecting one device to another, for example by plugging the "male" portion of, say, a cable into the "female" portion of the connector, which could reside in a laptop or desktop computer. One type of connector manufactured by Lotes is the Universal Serial Bus (USB) 3.0 connector.  Lotes competes directly with the Defendants in making and selling of USB 3.0 connectors.

16.     The USB 3.0 connector is the latest generation of USB connector and is a significant improvement over the USB 2.0 connector, providing for much faster data transfer rates across the connection. This greater capacity is critical to using new generations of programs and applications that require much greater data, such as graphic data, to use. The USB connector is the most successful PC peripheral interconnect ever defined, and it has migrated heavily into the consumer electronics and mobile device markets.  Used primarily to connect computer peripherals to personal computers, the USB connector allows, for example, digital cameras, external hard drives, keyboards, computer mice, and many other peripherals to transmit data between the peripheral and a computer over a standardized data link.  In addition, printers use USB connections to interface directly to digital cameras, and PDAs use USB connected keyboards and mice.  On information and belief, over 2 billion USB devices were shipped in 2006, and there are over 6 billion USB products in the stream of commerce today.

17.     USB connectors have become a critical component of contemporary computers and consumer electronic devices.  These devices all possess several common features:  They all require USB connectors to interact with other devices; those manufactured and sold without USB connectors are undesirable and of limited use; and they all play into markets in which consumers demand access to the best available technology – meaning that, at the present time, USB connectors are a practical necessity for all competitors in these markets.

18.     Furthermore, the USB Implementers Forum, Inc. ("USB-IF") (the SSO governing USB standards) vetted and incorporated the patents and other intellectual property (IP) relevant to the USB 3.0 standard, and on information and belief, secured appropriate global rights from all its contributors under the Contributors Agreement as a prerequisite to adoption of the standard and before offering those rights to adopters, like Lotes, in their Adopter Agreement.  As a result, all Adopters possess all IP rights necessarily to manufacture and sell products containing USB 3.0 connectors anywhere in the world, including explicitly both China and the U.S. (*See* Contributors Agreement, Exhibit A at ¶ 3.4).

19.     The products of particular relevance to this matter are USB 3.0 connectors, specifically though not exclusively those intended for incorporation into motherboards.  "Motherboard" is the technical name for the main printed circuit board powering a computer.  The motherboard typically contains the computer's principal components (e.g., the processor and memory chips), along with internal and external connectors – almost always including at least one USB connector.  For large computers, motherboards are typically manufactured in one plant and then shipped to another for assembly into the computer.  Because the size limitations of a notebook limit the number of components capable of fitting into the casing, and because of the centrality of the motherboard to the product, motherboards and the notebooks they power are

almost always assembled at the same plant.   As a result, companies that manufacture USB connectors (e.g., Lotes and the Defendants) typically sell directly to notebook manufacturers and to companies making motherboards for servers and desktops.  Those products, in turn, make their way into the hands of businesses and consumers around the globe.  Defendants' anticompetitive behavior is designed either to foreclose Lotes from several relevant competitive markets or to raise Lotes' costs in those markets to the point that Lotes becomes uncompetitive and Defendants become a monopoly, which is their professed intention.

20.   According to industry sources and press reports, as of 2011 roughly 94% of global notebook computers were assembled by a small number of Taiwanese vendors, primarily Original Design Manufacturers (ODMs) maintaining production facilities in China.  Almost all notebooks contain several USB connectors, and the technology is shifting quickly towards USB 3.0 (also known as SuperSpeed USB).  Adoption rates of USB 3.0 connectors is forecast to reach 100% by 2013 (from only about 1% as recently as 2010).  The assembly of motherboards for computers other than notebooks is similarly concentrated.

21.   On information and belief, Foxconn is the world's largest supplier of motherboards and alone supplies the USB components for roughly 50% of all notebooks sold worldwide – including the United States.  On information and belief, Foxconn builds computers for many brands, including Acer, Dell, and Hewlett-Packard (HP).  On information and belief, Hon Hai does maintain a significant relationship with HP focused on HP's North American sales, operates as a key supplier to Apple, and supplies other notebook brands.  Lotes' share of this global market is in the neighborhood of 10-15%.  On information and belief, market shares for desktop and server computers are comparable.  Lotes and the Defendants are thus all competitors in both the global and U.S. markets for supplying USB 3.0 connectors into

notebooks and motherboards for desktops and servers. Defendants maintain manufacturing facilities capable of meeting growing demand as they take various actions to damage competitors and limit competition in these markets.

22.    On information and belief, both Lotes and the Defendants directly compete for market share in the markets for USB 3.0 connectors for notebooks, desktops, and servers by selling to the following ODMs who make and assemble computer products for many well-known brands.  On information and belief, to the best of Lotes' knowledge, a breakdown of USB 3.0 connector sales to several major notebook ODMs (along with their products) are listed in the table below showing approximate percentages:

Table 1

| ODM | Foxconn including its contracted suppliers | Lotes |
|---|---|---|
| Quanta (Notebooks made for HP, Dell, Toshiba & Fujitsu) | 65% | 10% |
| Compal (Notebooks made for HP, Lenovo, Acer, Toshiba, Asus & Dell) | 25% | 20% |
| Pegatron (Motherboards for desktops and notebooks) | 80% | 5% |
| Inventec (Notebooks for HP & Lenovo) | 50% | 35% |
| MSI (Motherboards for desktops & notebooks) | 40% | 30% |
| Wistron (Motherboards for desktops & notebooks) | 40% | 0% |

23.    On information and belief, Hon Hai and/or Foxconn own and operate factories assembling notebooks and motherboards for desktops and servers (putting their USB 3.0

connectors into these products) around the world, including China, Taiwan, and the United States.  On information and belief, Hon Hai operates a factory in Houston, Texas, presumably for the United States market.  On information and belief, Hon Hai also operates one or more factories in Mexico that build server or desktop computers for Dell's sale in the United States market.

24.    On information and belief, the USB 3.0 connectors made and sold by Hon Hai and Foxconn for export into the United States as part of notebooks or motherboards for desktops and servers include at least the following product part numbers:  UEA0112C-4FH1-4F, UEA1112C-8HS6-4F, UEA1119C-HFD5-4F, UEA1112C-4HK1-4H, UEA1112C-FFB1-4H, and UEA1112C-8FS6-4F.

## STANDARDS IN THE COMPUTER INDUSTRY

25.    By way of background, a general discussion of technical standards will help serve to place this litigation in context.  There are many standards relating to interfaces between peripheral devices (such as printers, for example) and computers.  To facilitate interoperability among chipmakers, device makers, and computer makers, among others, companies participate in the development of technical standards that establish precise specifications for the interfaces, such as connectors, between devices.  Once the standards are established, competing manufacturers can offer their own products that are compliant with the standards and are able to connect with other devices, thus enhancing their "compatibility" and thus their value. It is the existence of such standards that might allow a consumer to hope, for example, that his or her printer can be connected to, and can operate with, his or her computer.

26.    Technical standards play a critical role in the development of computer/peripheral interoperability.  The economic and legal literature recognize that standards, and industry-wide participation in SSOs, combine significant pro-competitive benefits with significant anti-

competitive risks.  The conduct of companies that participate in the deliberations and adoption of a standard, and whose IP plays a role in the industry-wide implementation and use of that standard, is critical in  determining whether a particular standard is pro-competitive or anti-competitive *as implemented*.

27.     On the pro-competitive side, standards have the potential to encourage innovation and promote competition.  Product designers and manufacturers are more willing to invest in computer products because, so long as they are compliant with the interface standard, the products will operate effectively with numerous third party products.  Standards development can also reduce costs for both suppliers and purchasers.  For suppliers, standardization can reduce the need to customize products to varying specifications.  When a uniform (or standardized) product satisfies multiple purchasers, manufacturing volume and distribution can increase while per unit costs decrease.  Purchasers benefit from increased price competition among suppliers, each of whom incorporates the standard rather than launching incompatible product lines.  Because many suppliers make standards-compliant products, switching suppliers typically does not require a substantial redesign of a purchaser's products or a substantial technical transfer to enable the new supplier to produce compatible products.  The lower "switching cost" intensifies competition among suppliers, leading to lower prices.

28.     On the anti-competitive side, technical standardization also creates a "lock-in" effect and a risk of "patent hold-up."  As competition within the standard replaces competition for the standard, innovation and R&D activities shift in directions that are not always beneficial.  Furthermore, because standards result from coordination and compromise among competitors, they often incorporate patented technology and/or other proprietary IP rights.  The incorporation of a proprietary right into an industry-wide standard necessarily increases the market for licenses

12

covering that right: anyone in the industry seeking to conform to the standard *must* secure appropriate licenses as a precondition for competitive entry.  In the absence of an agreement between a contributor and an SSO, the possessors of such proprietary IP rights could demand exorbitant terms from their licensees—or even refuse to license their rights altogether.  The anti-competitive nature of such behavior is manifest: an unscrupulous contributor to a standard can use the standard setting process to increase reliance on and commitment to its proprietary technology, and then to extract unreasonable, unfair, and anticompetitive royalties from companies adopting the standard in good faith.

29.     As a result, SSOs typically secure agreements to license all incorporated technology on Fair, Reasonable, And Non-Discriminatory terms ("FRAND"), or more commonly "RAND" terms, as a necessary condition for adoption of the standard.  Contributors gain certain competitive benefits by gaining industry-wide acceptance of their preferred technologies.  Their competitors or new entrants gain the ability to use those preferred technologies *without fear of litigation*.  The existence of such an agreement, and its implementation in a transparent manner, are thus central to determining whether a particular standard or SSO is, on balance, pro-competitive or anti-competitive.

30.     Without such practices, an SSO would risk being deemed an illegal trust for providing a forum in which competitors can determine which products will and will not be made.  RAND licenses are thus central to the viability of an SSO and the standards it promulgates.  They provide the necessary pro-competitive benefits by preventing patent owners from imposing monopolistic royalties, and by mitigating the threat that a single patent owner will hold up the entire industry. In short, the promise of RAND licenses is part of the consideration or  *quid pro quo* of the bargain struck between the SSO and its contributing intellectual property owners or

"contributors."

31. The USB-IF is the managing SSO for USB specifications. The USB-IF oversees and coordinates the standards for all USB connectors, including USB 3.0 connectors. The USB-IF has taken steps to ensure that the pro-competitive effects of all USB standards, including the USB 3.0 standards, outweigh their inherent their anti-competitive nature and eliminate the possibility of anti-competitive leveraging by contributors against adopters. The USB-IF successfully incorporated such safeguards into its agreements. Specifically, the USB-IF represents to adopters that it has secured royalty-free licenses to all IP necessary to practice the standard. Such terms, while not universal among SSOs, are common enough to have earned two shorthand representations: they are known as RAND-Zero or RAND-Z terms. When Lotes accepted the terms of the USB-IF's Adopters Agreement, the USB-IF explicitly granted Lotes' RAND-Zero licenses on all "Necessary Claims" (as defined in the Adopters Agreement, and in information and belief in the Contributors Agreement). Lotes is also a third party beneficiary of any agreements made between Defendants and the USB-IF.

## PROMISES MADE BY HON HAI AND FOXCONN TO THE STANDARDS SETTING ORGANIZATION

32. By way of background, on information and belief, Hon Hai is ranked 43rd on Fortune's Global 500 and is the largest manufacturer of consumer electronics in the world, making and assembling consumer products for brands such as Apple, Dell, Hewlett-Packard, Motorola, Nintendo, Sony and Nokia, to name a few. On information and belief, Hon Hai invested in Foxconn International CI to manufacture goods in China and other places. (*See* http://www.foxconn.com.). On information and belief, Defendants are multi-national companies operating as independent entities. On information and belief, consumer brand electronics companies contract with Foxconn as an ODM to manufacture their goods, typically in Foxconn's

factory cities in China.

33.     As introduced above, Foxconn is an ODM.  An ODM designs and manufactures a specified product which is branded by another company.  This allows the branding firm to produce a product without having to build, organize, and run a factory.  This business model goes by the term "outsourcing."  Brand name consumer electronics companies use outsourcing to make their products cheaper by using ODMs.  ODMs are expert at mass-producing electronic products cheaply by locating their factories near the source of needed commodities and transportation hubs and hiring low cost labor.  ODMs are also used by brand name companies to have their products made in low-cost countries who have laws that are not favorable to foreign ownership of property.

34.     The combination of Hon Hai and Foxconn is a colossus with dominant market power as a manufacturer of cell phones, tablets, computers, digital cameras, and digital televisions, to name but a few products, sometimes being the sole source supplier for its customers.  For example, on information and belief, Foxconn manufactures one hundred percent (100%) of all iPhone5 products and over ninety percent (90%) of all iPad products for Apple.  On information and belief, Foxconn manufactures computers for numerous brand names, including HP, Dell, IBM, Apple, Acer, and Sony.  On information and belief, Foxconn manufactures forty percent (40%) of the MacBook and twenty percent (20%) of the iMac.  On information and belief, Foxconn also manufactures the e-readers for Amazon and LCD TVs for Sony and Sharp.  Almost all of the foregoing products made by Foxconn have at least one USB connector.  On information and belief, as part of its business, Foxconn Kunshan incorporates USB 3.0 connectors made into motherboards, which are then incorporated into the product manufactured by one or more of the Defendants.

35.    On information and belief, Foxconn Kunshan is part of a family of Foxconn companies that collectively is among China's largest exporters.  Foxconn alone currently possesses significant market power in the markets for USB 3.0 connectors for inclusion in notebooks and motherboards for desktops and servers, with a notebook share believed to be in excess of 50%.  The addition of Hon Hai – another significant competitor in the previously described markets, for whom numbers are harder to discern, whether considered as part of a single corporate family or as a co-conspirator – increases the Defendants' market power even further.  Foxonn's sudden rise to power was accomplished in the no-holds-barred and virtually unregulated consumer electronics assembly and manufacturing sector in Asia.  Foxconn is infamous for its sharp and unscrupulous business practices in its quest to squeeze a profit without regard to legal or ethical norms.  Foxconn has continued its unscrupulous business practices in the standards setting arena by abusing the standards setting process to gain monopoly power and by conspiring to restrain trade, among other things, as further described below.

36.    On information and belief, Intel Corporation ("Intel") formed the USB-IF in 1995 as a non-profit corporation with other industry players to support and accelerate the adoption of USB-compliant peripherals.  On information and belief, the USB-IF has over 700 member companies worldwide, and its board of directors includes representatives from Intel, HP, LSI Corporation, Microsoft Corporation, Renesas Electronics Corporation, and ST-Ericsson.

37.    On information and belief, Intel was instrumental in organizing the technical standard for USB 3.0, which allows different manufactures to produce connectors and devices that could communicate seamlessly over a USB 3.0 connector.  On information and belief, the USB 3.0 standard was developed by six companies collectively named the "USB 3.0 Promoter Group," consisting of Intel, HP, Microsoft, NEC (now known as Renesas Electronics), ST-NXP

16

Wireless (now known as ST-Ericsson), and Texas Instruments.  On information and belief, the USB 3.0 Promoter Group on November 17, 2008, released the USB 3.0 technical specification and formally transitioned the standard to USB-IF.  On information and belief, the branding of USB 3.0 connectors is protected by the trademarked logo "SuperSpeed."

38.     Lotes signed the Contributors Agreement with Intel on December 11, 2007.  A true and correct copy of the Contributors Agreement is provided at Exhibit A.  On information and belief, in 2007 or 2008, Defendants and Intel executed the same Contributors Agreement signed by Lotes and Intel.  On information and belief, Defendants are bound by Section 3.4 of the Contributors Agreement entitled "Limited Patent Licensing Obligations in Contributions," which states as follows:

> Effective upon the Promoters adoption of the Final Specification, for any Contributions made by Contributor, Contributor hereby agrees that upon request, it will, and will cause its Affiliates to, grant to any Promoter or Adopter, and their respective Affiliates, (collectively, "Licensee") a non-exclusive, world-wide license under any Necessary Claim of a patent or patent application reading on such Contributions, to make, have made, use, import, sell, offer to sell, and otherwise dispose of Compliant Portions; provided that such license need not to extend to any part or function of a product in which a Compliant Portion is incorporated that is not part of the Compliant Portion.  Such license shall be granted on a _royalty-free_ basis and under otherwise reasonable and non-discriminatory ("RAND-Zero") terms, provide that such license grant may be conditioned upon, including but not limited to, the Licensee's grant of a reciprocal license binding Licensee.

(Emphasis in original).

39.     Lotes signed the Adopters Agreement on December 29, 2008, within the "Adoption Period," as required.  A true and correct copy of the Adopters Agreement signed by Lotes and Intel is provided at Exhibit A-1.  On information and belief, in 2007 or 2008, Defendants and Intel executed the same Adopters Agreement signed by Lotes and Intel. Defendants, like Lotes, are therefore both "Contributors" and "Adopters" of the USB 3.0 Standard and are therefore bound by the terms of the USB-IF Contributors Agreement and

Adopters Agreement, both of which they voluntarily signed and accepted.

40.    On information and belief, Defendants accepted Section 2 of the Contributors

Agreement entitled "Compliance with Antitrust Laws" which states, in part, as follows:

> Contributor and Promoters are committed to fostering open competition in the
> development of products and services based on the Final Specification.  Contributor and
> the Promoters understand that in certain lines of business they are or may be direct
> competitors and that it is imperative that they and their representatives act in a manner
> that which does not violate any state, federal or international antitrust laws and
> regulations.

41.    On further information and belief, Defendants are bound by Section 2.1(b) of the

Adopters Agreement, entitled "Limited Patent Licensing Obligation," which states as follows:

> By Adopter.  Effective upon adoption by the Promoters of the Final Specification,
> Adopting Party and its Affiliates hereby agrees that it will grant to each of the Promoters
> and all Adopters and their respective Affiliates (also collectively "Licensee"), a
> nonexclusive, worldwide license under its Necessary Claims solely to make, have made,
> use, import[,] offer to sell, sell and otherwise distribute and dispose of Compliant
> Portions; provided that such license need not extend to any part or function of a product
> in which a Compliant Portion is incorporated that is not itself part of the Compliant
> Portion.  Such license shall be granted on a royalty-free basis and under otherwise
> reasonable and non-discriminatory terms, provided that such license may be conditioned
> upon Licensee's grant of a reciprocal binding license binding Licensee.

42.    Notwithstanding repeated attempts by Lotes to engage Hon Hai in patent license

negotiations under the terms of the Adopters Agreement and the Contributors Agreement, Hon

Hai has not entered into good faith negotiations with Lotes about a license to USB 3.0 patents.

On February 24, 2011, Hon Hai sent a registered letter to Lotes offering to license Necessary

Claims on a RAND-zero basis and other claims relating to USB 3.0 connectors on a RAND basis

– seeming to open such negotiations – that included a non-disclosure agreement ("NDA"),

purportedly to allow licensing discussions to proceed.  On March 25, 2011, Lotes returned a duly

executed copy of that NDA  to Hon Hai. On April 15, 2011, Mr. Tony Tsai, Hon Hai's in-house

counsel, directed Lotes by email to contact Hon Hai's outside counsel regarding the licensing

negotiation.

43.     On April 20, 2011, Mr. Gregory L. Lippetz of the Jones Day law firm emailed Mr. Eric Young, in-house counsel for Lotes, stating that his firm represented "Hon Hai in connection with USB 3.0 licensing activities."  Mr. Lippetz stated that Jones Day was "currently developing licensing agreements for Hon Hai's USB 3.0 patents and will be in touch with you in the near future to discuss your interest in licensing these patents."  A true and correct copy of the email dated April 20, 2011, from Mr. Lippetz to Mr. Young, is provided at Exhibit B.

44.     Six months passed without Lotes receiving a draft license agreement. On November 3, 2011, Mr. James Chadwick, outside counsel for Lotes, sent correspondence to Mr. Lippetz requesting a draft license agreement.  On December 1, 2011, Mr. Lippetz responded to Mr. Chadwick by email and indicated that a response would be forthcoming on the following week.  There was no further communication from Hon Hai's licensing counsel.

45.     As set forth herein, Lotes made numerous good faith efforts to negotiate with Hon Hai about proceeding with RAND-zero licensing arrangements.  Hon Hai did not respond in kind.  Meanwhile, as discussed below, Foxconn Kunshan prepared to sue, and then sued, Lotes' subsidiaries in China under the same Necessary Claims that Defendants are legally obligated to license to Lotes "and its affiliates."  These same Necessary Claims are part of what at least one of the Defendants provided as "Contributions" to the USB 3.0 standard as a Contributor during the standards setting process.  Hon Hai has never continued or completed RAND-zero licensing arrangements for USB 3.0 connector-related patents.  Hon Hai has remained stonily silent on the issue, not even explaining why it unilaterally broke off licensing discussions.

46.     In a letter dated February 10, 2012, using Hon Hai letterhead, Mr. Ben Sley, Sr. In-House Counsel and a U.S. Patent Attorney for Foxconn Electronics, Inc., sent a letter to Mr. Jeffrey L. Ravencraft, President and COO of USB-IF ("the USB-IF Letter").  The

correspondence states, in part, as follows:

> Hon Hai Precision Industry Co., Ltd. and the Foxconn Technology Group (collectively, "Foxconn") are pleased to be active contributors of the USB 3.0 project and early signers of the USB Contributors Agreement.  Foxconn unequivocally affirms that it will make the "Necessary Claims" used in connection with all USB 3.0 "Compliant Portions" – i.e., that IP that is necessary to practice the USB 3.0 specification – available to other USB 3.0 contributors and adopters under RAND-Zero terms pursuant to the USB 3.0 Contributors Agreement.  In addition to those Necessary Claims, Foxconn holds other IP that is necessary to practice the USB 3.0 specification, but that may be optionally incorporated into USB 3.0 connectors.  Foxconn unequivocally affirms that it will license its IP covering these optional features on RAND terms.

The letter above is an admission that the Defendants have executed the Contributors agreement and are bound by its terms.  Also, the letter from the Defendants tracks the license grant language used in the USB 3.0 Adopters Agreement and also serves as an independent promise that the Defendants will provide a license grant of all "Necessary Claims" in their patents as well as "IP that is necessary to practice the USB 3.0 specification," promises upon which Lotes has relied. Lotes relied on these sorts of representations in adopting USB 3.0 technology and in signing the Contributors and Adopters Agreements.  In the letter, Attorney Sley refers to the "Foxconn Technology Group" collectively and purports to act for, represent, and bind *all Defendants* as a group.  A true and correct copy of the letter dated February 10, 2012, from Mr. Sley to USB-IF is provided at Exhibit C.

### DEFENDANTS ABUSE THE STANDARDS SETTING ORGANIZATION BY RENEGING ON THEIR EXPRESS AGREEMENTS AND PROMISES

47.     The factories that Lotes has built to make USB 3.0 connectors for export to the U. S. are located in China.  Because Lotes' facilities are subject to Chinese law, all attempts to enforce Chinese patents covering aspects of the USB 3.0 standard necessarily affect commerce in the U.S.  Consequently, any attempts by Contributors to and or Adopters of the USB 3.0 standard, who manufacture or sell a given product, to enforce their patent rights beyond the

scope of the terms offered and accepted in the Adopters Agreement against competing manufacturers, necessarily represents an attempt to drive those competitors out of the market – or at a bare minimum to raise their costs – thereby reducing the competitive nature of the U.S. market for these products.  Anything that affects the price, quantity, or competitive nature of the production market for USB 3.0 connectors will therefore have a direct, substantial, and reasonably foreseeable effect on U.S. commerce in precisely the ways that the antitrust laws were created to prevent.

48.     Lotes has invested millions of dollars in research & development and has built two factories in China for its employees to make USB 3.0 standards compliant connectors, among other things, for export to the United States and around the world.  Lotes has contractual obligations to distributors and customers in the United States and abroad who are expecting to take delivery of its USB 3.0 connector products.  Lotes entered into these contracts in reliance upon the promises and assurances of the USB-IF standards group and its participants, explicitly including the Defendants.  Specifically, Lotes relied upon: the Contributors Agreement and Adopters Agreement, executed by Hon Hai and/or Foxconn, on information and belief, that obligated the Defendants to license on RAND-Zero terms all the patent claims necessary to make, use and sell USB 3.0 connectors ("the Necessary Claims"); the April 2011 assertions by Hon Hai's attorneys at Jones Day representing that Hon Hai was ready to license its USB 3.0 patents; and the February 10, 2012 Letter from the Defendants to USB-IF "unequivocally affirming" that they would license their patents on RAND-Zero terms pursuant to the Contributors Agreement to "other USB 3.0 contributors and adopters."

49.     Notwithstanding binding contractual obligations to provide a world-wide license to its USB 3.0 patents on RAND-Zero terms and their unequivocal written affirmations to the

USB-IF that they would abide by the Contributors Agreement, Defendants have violated their agreements and promises to the industry, thereby undermining the safeguards that the SSO put in place to guard against abuse, threatening to undermine the viability of the USB 3.0 standard, and rendering the USB-IF little more than an anti-competitive cartel operating to the detriment of U.S. consumers.

50.     Given the USB-IF's insistence on specific language in the Contributors Agreement and Adopters Agreement waiving various rights and granting all adopters RAND-Zero licenses to all necessary IP *world-wide*, the USB-IF must have considered acceptance of these terms critical to inclusion in the standard.  Had the Defendants represented their plans accurately and honestly, the USB-IF likely would have excluded their IP from the standard and substituted an equivalent technology.  Had the USB-IF determined that such an exclusion was impractical or impossible, it would have—at a bare minimum—altered the Adopters Agreement to reflect the consequent limitations on the scope RAND-Zero licenses.  Lotes and other adopters would thus have been on notice of the need for appropriate action prior to sinking capital investment or accepting contractual obligations.

51.     Either way, Defendants' misrepresentations to the USB-IF allowed them to misuse their patent monopolies by leveraging their market power from the four corners of their patent portfolios, which extended no farther than SuperSpeed USB connectors incorporating their patented technology, to the much broader market of all USB connectors conforming to the USB 3.0 standard.  In essence, by deceiving the USB-IF and its other contributors into eliminating competing technologies from the market, the Defendants gained market power in the broader market, where their patents alone had not conferred it.  On information and belief, Hon Hai and Foxconn have contacted the customers and distributors of Lotes to allege that they have

22

the sole patent rights on USB 3.0 connectors and would sue them if they did not buy from Foxconn.  Furthermore, Hon Hai and Foxconn have refused to license on RAND-Zero terms other manufacturers of USB 3.0 connectors and have sent out warning letters threatening these manufacturers with patent litigation.

52.     Around the same time, Foxconn sources began to feed their monopolization plans to the press, specifically including the trade press in Taiwan – where many of Lotes' customers and potential customers would be sure to see it.  For example, one article in the Commercial Times headlined that "USB 3.0 Connector Patents:  Foxconn Takes All, First to obtain relevant patents, initially expected to monopolize market, approximately 2.3 billion devices estimated to use USB 3.0 in 2015."  The article attributed this information to a Foxconn source.   A true and correct copy of the Commercial Times article dated February 23, 2010, along with the English translation is provided at Exhibits D and D-1.

53.     In breach of their contract obligations and public affirmations, Defendants conspired (or in the alternative, acted as a single entity) to have Foxconn Kunshan initiate patent enforcement proceedings in China to enjoin Lotes from making and selling USB 3.0 connectors. Specifically, the Defendants filed a patent enforcement actions against Lotes SuZhou, a Lotes subsidiary located in the JiangSu province of Eastern China, to stop it from making USB 3.0 connectors.  In addition, Foxconn Kunshan has also initiated patent enforcement proceedings against Lotes GuangZhou, a Lotes subsidiary located in the GuangDong province of Southern China, and against a retail store named Jiang Hon Han Commercial Center.  The patents asserted by the Defendants are Chinese Patent Nos. 200820138608.0 ("the '608.0 patent") and 200810128623.1 ("the '623.1 patent") against Lotes SuZhou (collectively, "the Asserted Patents").  The asserted claims of the Asserted Patents are Necessary Claims under the

Contributors Agreement and the Adopters Agreement and are therefore explicitly subject to RAND-Zero licenses.

54.     Because the '608.0 patent claims priority to U.S. Pat. No. 7,481,677 ("the '677 Patent"), and the '623.1 patent claims priority to U.S. Pat. No. 7,625,243 ("the '243 Patent"), the specifications of these U.S. patents must support all claims in the corresponding Chinese patents. As a result, an analysis of these specifications provides the outer bounds of the asserted Chinese claims, even in the absence of a formal claim construction. On information and belief, and based on what Lotes knows at this time, the claims being asserted in China are Necessary Claims as defined in the Contributors Agreement and Adopters Agreement signed by Defendants and must be licensed to Lotes on RAND-zero terms.

55.     Foxconn Kunshan and Hon Hai are listed as joint owners on the face of the Asserted Patents.  In an orchestrated conspiracy with its co-Defendants, (or in the alternative acting as a single entity) Foxconn Kunshan brought these enforcement actions in bad faith and for malicious purposes. Defendants knew or should have known that the Asserted Patents contain Necessary Claims under the Contributors Agreement, the Adopters Agreement, and the Letter to USB-IF, and specifically that the asserted claims qualify as Necessary Claims.  Therefore, Lotes either *already has* a RAND-Zero license to the Asserted Patents or, in the alternative, *has an irrevocable right* to a RAND-Zero license, as expressly granted by the Defendants when they agreed to be bound by the Contributors Agreement and the Adopters Agreement.  True and correct copies of the Asserted Patents, along with their respective – but unasserted – counterparts filed in the U.S. Patent and Trademark Office ("USPTO"), are provided in Exhibits E, E-1, F and F-1.

56.     Defendants' patent enforcement actions on the Asserted Patents were initiated

under Article 60 of the Chinese Patent Law against two Lotes manufacturing entities in China.

The first enforcement action was filed against Lotes SuZhou on July 9, 2012, in the JiangSu

Intellectual Property Office, a department of the State Intellectual Property Office of the P.R.C.

("SIPO") located in the JiangSu province.  True and correct copies with English translations of

the Requests for Disposition of Patent Infringement Dispute filed by Foxconn Kunshan in the

JiangSu Intellectual Property Office are provided in Exhibits G, G-1 and H, H-1.

57.     Concurrently, Foxconn Kunshan initiated a second patent enforcement

proceedings on the Asserted Patents against Lotes GuangZhou, a Lotes subsidiary located in the

GuangDong province of Southern China, and against a retail store named Jiang Hon Han

Commercial Center, to enjoin them from making and selling USB 3.0 connectors. Jiang Hon Han

Commercial Center sells motherboards to consumers.  These motherboards are made by Lotes'

customer Gigabyte and contain USB 3.0 connectors made by Lotes.   True and correct copies

with English translations of the Requests for Disposition of Patent Infringement Dispute filed by

Foxconn Kunshan are provided in Exhibits I, I-1 and J, J-1.

58.     By way of example, the Request for Disposition of Patent Infringement Dispute in

Exhibit G-1 specifies that USB 3.0 connectors made by Lotes be enjoined and destroyed, as

follows:

> That the Requestee [i.e., Lotes] be ordered immediately to stop production and sale of
> USB 3.0 electrical connector products (model nos. ABA-USB-079-XXX, ABA-USB-
> 036-XXX, etc.) which are infringing the requestor's invention patent  ZL
> 200820138608.0, that it destroy the infringing products in stock, the special die and other
> special tools used specifically to manufacture the aforesaid infringing products, the
> infringing product packaging and instructions, promotional materials for related products,
> and product drawings and catalogues.

The Lotes USB 3.0 connectors specifically named in the enforcement action above, ABA-USB-

079-XXX and ABA-USB-036-XXX, are among the Lotes products shipped for use in the United

States market.  Stopping production of the targeted connectors would disrupt the supply of computer products into United States, especially notebook computers.

59.    Foxconn KunShan similarly sought to direct Jiang Hon Han to stop the sale of all products containing the ABA-USB-079 and ABA-USB-036-XXX connectors.  The breadth of Foxconn KunShan's enforcement action implicitly threatens *all* manufacture and sale of Lotes USB 3.0 connectors.  On information and belief, the JiangSu Intellectual Property Office has the power to shut down Lotes' production lines, including those manufacturing products for export into the United States.  On information and belief, Foxconn KunShan can withdraw this enforcement action at any time.  On information and belief, the JiangSu Intellectual Property Office has advised Foxconn KunShan to withdraw the Requests for Disposition of Patent Infringement Dispute, and Foxconn KunShan has refused.

60.    To appreciate the breadth of these actions, it is important to note that the relevant construction of the Chinese patents is the one that the Chinese plaintiffs assert, not one that Lotes may assert or one that a Chinese court might adopt.  The action in China is an attempt to enforce the Chinese patents *within the scope of coverage that the Chinese patentees assert*.  The Chinese plaintiffs, by filing their infringement suit, have expressed the belief that Lotes' accused products fall within the claim scope, notwithstanding Lotes' status as an Adopter of the USB 3.0 standard in consequent possession of all licenses necessary to practice the standard.

61.    In addition to the two targeted product lines discussed above, Lotes ships the following USB 3.0 connectors into the United States:  ABA-USB-051, ABA-USB-053, ABA-USB-077, ABA-USB-085, ABA-USB-087, ABA-USB-094, ABA-USB-104, ABA-USB-117, ABA-USB-126, ABA-USB-130, and ABA-USB-144.  Any patent enforcement actions against the aforementioned products would further impact competition in the United States.

Furthermore, patent enforcement actions in China against two USB 3.0 connectors made by Lotes serves to chill Lotes' sales of its entire USB 3.0 product line.  Manufacturers of notebooks and motherboards are risk-averse and do not want to have their manufacturing disrupted by Defendants' potential lawsuits.

62.     According to the face of the '677 Patent (the U.S. counterpart to the Chinese '608.0 patent), the named inventors are Chong Yi and Joseph Ortega.  According to the face of the '243 Patent (the U.S. counterpart to the 623.1 patent), the named inventors are Kuan-Yu Chen, Chong Yi, James M. Sabo, Joseph Ortega, and Gary Biddle.  According to these U.S. patents, all of the inventors reside in Pennsylvania.  Attached hereto as Exhibit A-2 are the first seven pages of USB 3.0 Specification, Rev. 1.0, June 6, 2011 ("the USB 3.0 Specification").  According to the USB 3.0 Specification, all of the aforementioned named inventors are listed as "Contributor Company Employees" of Foxconn who "contributed to the development of the specification."  See Exhibit A-2 at pages iii and v.  On information and belief, the asserted claims of the '608.0 patent and the '623.1 patent are "Necessary Claims" and "Contributions" as defined by the Contributors Agreement, which were contributed by at least one of the Foxconn Defendants and/or Hon Hai.

63.     Because Hon Hai and Foxconn Kunshan are "Contributors," Lotes is an "Adopter," and the asserted patent claims are "Necessary Claims" under the Contributors Agreement and Adopters Agreement, the Defendants are obligated to grant Lotes a RAND-Zero license to the Asserted Patents, or at the very least to the asserted claims, per the explicit terms of those governing agreements.  In the absence of such a license, if Defendants' actions forces the closure of Lotes' factories or raises Lotes' costs on relevant USB 3.0 connector products, numerous companies, including major U.S. companies, would face loss or compromise of their

electronics products. Lotes has already contracted to supply its USB 3.0 connector products to various manufacturers of notebooks and motherboards who will incorporate Lotes' USB 3.0 connectors into their products.  These notebooks and motherboards find their way to ODMs who manufacture finished goods for brands such as Asus, Gigabyte, Acer, Pegatron, Toshiba, Lenovo, Dell, and HP, which are shipped to the United States for distribution in numerous retail consumer outlets like Best Buy, Costco, Target, Wal-Mart, and others.  In short, Foxconn and Lotes are direct competitors in the USB 3.0 connector market, and specifically the sub-markets of motherboards and notebooks. Defendants' actions threaten to undermine all of Lotes' existing and prospective contracts, to reduce competition, to restrict supply, and to increases prices that direct purchasers will inevitably pass on to U.S. consumers.

64.     The loss of Lotes in the USB 3.0 connector market would thus damage competition, increase prices, and harm consumers in the United States.

## DEFENDANTS' CONDUCT IS CAUSING COGNIZABLE ANTITRUST INJURY IN THE UNITED STATES

65.     The relevant markets for assessing  Defendants' antitrust conduct include those for USB 3.0 connectors and are the markets for USB 3.0 connectors suitable for integration into motherboards powering notebooks, desktop computers and servers.  Defendants, through their Chinese subsidiaries and/or partners, allege that Lotes is infringing their patents simply by making products conforming to the USB 3.0 standard.  Defendants are wrongfully using their foreign patents to raise prices and exclude competition in the USB 3.0 connector market in the United States.  Defendants acquired this power as a result of misrepresentations to the USB-IF during the standards-setting process and/or a refusal to adhere to the obligations that they undertook to the USB-IF and its adopters (including Lotes).

66.     Computer makers around the globe have converged on the USB standard as almost the exclusive means for connecting peripheral devices with personal computers, notebooks, tablets and other computing products.  The migration from USB 2.0 to USB 3.0 is almost complete, with most computers having USB 3.0 connectors as the interface of choice. (For example, the Hewlett-Packard Pavilion dv6-7043cl notebook computer, currently available at Costco, has three USB 3.0 ports and one USB 2.0 port).

67.     A company attempting to introduce and market a connector incompatible with USBs would face a steep barrier to entry: the collective switching costs of device manufacturers and consumers around the world.  For all practical purposes, access to the IP necessary to practice the USB 3.0 standard is a prerequisite for competing in numerous device markets, including but not restricted to motherboards.  As a result, any attempt to restrict the practice of the USB 3.0 standard will have a ripple effect on the markets for manufacturing and selling devices throughout the computing and consumer electronics industries (and beyond).

68.     Defendants' deceptive behavior has already placed Lotes under a cloud of litigation intended to interfere with Lotes' existing and prospective customers.  If allowed to proceed, Defendants' conduct is likely to have the desired effect of driving Lotes from the markets for devices that incorporate USB 3.0 connectors.  Lotes maintains its entire manufacturing capability for USB 3.0 products in China, at the Lotes SuZhou and Lotes GuangZhou facilities that Defendants have targeted for closure in their Chinese patent suits.  The connectors that Lotes produces at these facilities are components of motherboards and other devices intended predominantly for export to the United States, the world's biggest market for computer products.  For example, Lotes sells its UBS 3.0 connectors to Quanta Computer, Inc. ("Quanta") and Compal Electronics, Inc. ("Compal") who build products for Dell Computer.

Similarly, Lotes sells its USB 3.0 connectors to Quanta, Compal, and Inventec Corp.

("Inventec"), who build products for HP.  Quanta, Compal and Inventec are ODMs that compete

with Foxconn.  Defendants are well aware of this supply chain and are actively and purposely

seeking to disrupt the contracts Lotes has with these competitor ODMs and to choke the flow of

goods into the United States.  Defendants have market power, and their concerted actions are

increasing their market power and progressively crippling the markets for USB 3.0 connectors in

notebook computers and in motherboards used in servers and desktop computers.

  69. The patent enforcement proceedings against Lotes SuZhou and Lotes GuangZhou

have resulted in confusion and uncertainty that has complicated and endangered all of Lotes'

existing and prospective business relationships.  These proceedings appear intended to leverage

the threat of an injunction to drive Lotes' business toward the Defendants—already the largest

players in competitive oligopolistic markets surrounding the use of USB connectors.

Consequently, these proceedings also threaten a potentially significant decrease in competition in

the United States markets for: USB 3.0 connectors; motherboards containing USB 3.0

connectors; and notebooks containing USB 3.0 connectors.  Should an injunction issue

preventing Lotes from manufacturing in China—in direct contravention of Defendants'

obligations and representations to the USB-IF—Defendants would likely become the dominant

suppliers to the U.S. market, effectively eliminating Lotes as a major competitor, upsetting the

supply chain and adversely affecting consumers by raising prices.

  70. Hon Hai and Foxconn are doing precisely what the USB-IF standards body was

set-up to prevent:  illegally conspiring to keep competing manufacturers, such as Lotes, out of

the various markets for devices that incorporate USB 3.0 connectors.  After Defendants have

locked their IP into the USB 3.0 standard and waited for the entire industry to make significant

capital investments and incur contractual commitments to deliver devices incorporating the USB 3.0 connector standard, Defendants are now unfairly taking advantage of the prohibitive switching costs inherent in revising the standard.  By changing the rules in the middle of the game and violating the antitrust laws, Defendants hope to recoup an inequitable windfall by threatening or actually instituting litigation on IP that had agreed-upon terms of RAND-Zero royalty.

71.     Defendants' attempts to leverage their Chinese patents in a manner capable of hampering Lotes' (or other competing manufacturers') production represents an attempt to monopolize any and all device markets in which the targeted competitor, or its downstream customers, competes—particularly given the critical role that Chinese manufacturing plays in the global supply chain.  Furthermore, Defendants' willingness to bring suit against Lotes in contravention of the USB-IF RAND-Zero terms has an *in terrorem* effect capable of curbing competitive manufacture and raising prices to U.S. consumers across the full range of products incorporating USB 3.0 connectors.

72.     Several things are clear.  First, the market for notebooks is an oligopoly – precisely the sort of market structure in which monopolization attempts are most likely to succeed, and thus the sort of market in which antitrust scrutiny is most warranted.  Second, Defendants possess significant market power in the market for notebook computers.  Third, because almost all notebooks sold in the United States will soon incorporate at least one USB 3.0 connector, the ability and right to practice the USB 3.0 standard is a prerequisite for participation in the market for notebooks.  Fourth, because notebook manufacturers typically contract with their suppliers in advance, a patent infringement suit raising significant questions about a supplier's right to practice the USB 3.0 standard will necessarily complicate if not preclude

entering into meaningful supply contracts—effectively chasing that supplier from the market whether or not the plaintiff is able to prevail on the infringement claim.  Fifth, on information and belief all of the above is equally true for the markets for motherboards powering desktops and servers.

73.     This scheme is the crux of Defendants' individual and/or joint attempts to monopolize the market for USB connectors incorporated into notebooks:

    a.  The notebook motherboard market, like the market for USB connectors feeding it, is already a concentrated oligopoly, the market structure in which credible attempts to leverage market power is most likely to tip that concentration into a monopoly;

    b.  Defendants already possess a significant share and considerable market power in this relevant antitrust market;

    c.  Defendants eliminated competing technologies from consideration by committing to license their own technology on RAND-Zero terms, thereby convincing the USB-IF to incorporate their patented technologies into the USB 3.0 standard;

    d.  Defendants then violated the representations and commitments they made to the USB-IF, reneged on their commitment to offer RAND-Zero licensing, and instead launched enforcement campaigns capable of raising rivals' costs and/or driving them from the market; and

    e.  The immediate elimination of some competitors, coupled with cost increases that hamper price competition from others, will allow Defendants to leverage their power into a monopolistic position.

74.     On information and belief, the same fact pattern holds true in the markets for

motherboards that power desktops and servers.

## FIRST COUNT
**(Breach of Contract – RAND-Zero and Other Standard-Related Misconduct)**
**(Against All Defendants)**

75.    Lotes incorporates and reasserts the allegations from all previous paragraphs of this Complaint.

76.    The Contributors Agreement and Adopters Agreement that both Lotes and Defendants entered into (*see* Exhibits A and A-1) were validly formed and entered into, and there are no defenses to such formation.  Lotes is a direct party to and/or a third party beneficiary of any contracts entered into by Defendants with the Promoters and/or the USB-IF. The agreements are enforceable by Lotes.

77.     Defendants entered into express contractual commitments with USB-IF and unequivocally affirmed that they would be bound by the Contributors Agreement and Adopters Agreement. Defendants thereby committed to license to Lotes all Necessary Claims (as defined by the Contributors Agreement and Adopters Agreement) on RAND-Zero terms. As noted above, Defendants made those promises by entering into the agreements, in direct correspondence with Lotes, and in correspondence with the USB-IF.  The claims being asserted against Lotes (and/or its subsidiaries) in China are "Necessary Claims" and must be licensed to Lotes and its affiliates on RAND-zero terms. Relying on these commitments are members, manufacturers, designers and sellers of products that implement USB 3.0 specification, including Lotes itself

78.    Each party implementing the USB 3.0 standard – including Lotes – is a third party beneficiary (if not a direct party) entitled to the benefits of Defendants' contractual commitments and promises.  It was material, indeed critical, to the contractual commitments of Lotes that

Defendants agreed to convey world-wide RAND-Zero licenses to all adopters the USB 3.0 standard – including Lotes.

79.     Defendants breached their commitments and obligations by failing to license the Necessary Claims and by conspiring with Defendant Foxconn Kunshan to claim infringement in China and by seeking to enjoin Lotes' subsidiaries/affiliates (specifically, Lotes SuZhou and Lotes GuangZhou) from practicing the USB 3.0 connector standard.  This conspiracy was carried out with bad intent and with the knowledge that the alleged inventions claimed in the Asserted Patents are licensed or promised to be licensed under RAND-Zero terms.  Lotes has a world-wide right to practice any valid patent owned by the Defendants – in China or anywhere else – with claims that read on the USB 3.0 standard, or in the alternative, Lotes has the right to a RAND-Zero license to these patents by virtue of the RAND-Zero commitments made by the Defendants.  Defendants have acted unreasonably and unfairly towards and discriminating against Lotes because Lotes is a competitive threat to the Defendants.  Defendants also appear to have violated the Non-Circumvention provision (para. 3.5) of the Contributors Agreement by suing in China.

80.     As a result of these multiple, material contractual breaches, Lotes has been injured, including in its business and property.  Lotes has been forced to expend resources resolving this licensing dispute, including defending itself before administrative tribunals in China in actions brought by Foxconn Kunshan which threaten to enjoin the manufacture and sale of its products.  Lotes has suffered or faces the threat of loss of profits, loss of customers and of potential customers, loss of goodwill, uncertainty in business planning, and uncertainty among customers and potential customers.

81.     The harm to Lotes is and was the direct, proximate, and foreseeable result of

Defendants' contractual breaches, for which Lotes is entitled to all remedies available under the agreements and the law, including, but not limited to specific performance, an injunction, and damages, including consequential damages to the extend allowed in the law.

### SECOND COUNT
### (Promissory Estoppel)
### (Against All Defendants)

82.     Lotes incorporates and reasserts the allegations from all previous paragraphs of this Complaint.

83.     Defendants have made clear and definite promises to potential licensees such as Lotes through their commitments in the Letter to USB-IF that the Defendants would license all Necessary Claims on RAND-Zero terms and honor all commitments, through their entry into the Contributors and Adopters Agreements, and in their direct communications to Lotes.  Defendants also explicitly promised to license to Lotes on RAND terms all claims from patents relating to the USB 3.0 connector market that are not Necessary Claims.  (*See supra* ¶¶ 42-45).

84.     The intended purpose of Defendants' promises was to induce reliance on the part of potential Adopters of the agreements.  Defendants knew or should have reasonably expected that their promises would induce companies such as Lotes to develop products compliant with the USB 3.0 connector standard, to forego other possible technologies, and to adopt the USB 3.0 standard in their production facilities, products, and contracts with other persons and companies.

85.     Lotes did in fact commit to the USB 3.0 standard and develop new products, and establish production facilities and contractual arrangements with others complaint with the UBS 3.0 standard, all in reasonable reliance on Defendants' representations.

86.     Defendants are estopped from reneging on these promises to USB-IF, its members, designers, and sellers of products implementing the USB 3.0 standard, under the

doctrine of promissory estoppel. Injustice to Lotes, and Lotes affiliates, customers, and suppliers, can only be avoided by enforcement of Defendants' promises.

87.     Lotes has been harmed as a result of its reasonable reliance on Defendants' promises.  Lotes has been forced to expend resources resolving this licensing dispute, including defending itself and its customer in China from allegations of patent infringement and efforts to enjoin its products notwithstanding its license to the Asserted Patents, or in the alternative its right to a RAND-Zero license to the Asserted Patents, or in the alternative its right to a RAND-Zero license to the Asserted Patents by virtue of Defendants' RAND-Zero commitments and Lotes' acceptance thereof.  Lotes is further threatened by the loss of profits, loss of customers and potential customers, loss of goodwill, uncertainty in business planning, and uncertainty among customers and potential customers.

88.     Lotes invokes this Court's equitable powers and requests that the Court order that Defendants license Lotes under all Necessary Claims of all USB 3.0 related patents that Defendants have world-wide on RAND-zero terms and under all other claims relating to USB 3.0 connectors on RAND terms.  Lotes further asks that the Court enjoin Defendants from asserting world-wide, including in China, all patents owned by one or more Defendants that purport to have claims that read on any part of the USB 3.0 standard.  Defendants also seek all damages allowable under the law.

89.     If Defendants are not found liable for breach of contract, then in the alternative, Defendants are liable to Lotes under a promissory estoppel theory, both for promises made in the Contributors and Adopters agreements and for promises not made in those agreements.

## THIRD COUNT
### (Declaration of Waiver)
### (Against All Defendants)

90.     Lotes incorporates and reasserts the allegations from all previous paragraphs of the Complaint.

91.     Defendants have executed the Contributors Agreement and expressly and unequivocally affirmed in at least one public letter to USB-IF that they would license on RAND-Zero terms the patents necessary to practice the USB 3.0 standard.

92.     Through these statements, Defendants have voluntarily and intentionally waived all rights to compensation for any patents covering the USB 3.0 standard for anything other than zero royalty.  Lotes asks the Court to declare that Defendants are obligated to license all Necessary Claims to Lotes on RAND-zero terms and all other claims relating to USB 3.0 connectors on RAND terms.  Lotes further asks the Court to explicitly declare that Defendants have waived any compensation or payments for licensing of the Necessary Claims.

93.     Lotes is suffering and will continue to suffer irreparable injury by reason of the acts and conduct of Defendants as alleged above until and unless the Court enjoins Defendants from asserting world-wide, including in China, all patents owned by one or more Defendants with claims purporting to cover the USB 3.0 standard. Lotes asks the Court to order Defendants to license Lotes under all such patents.

## FOURTH COUNT
### (Tortious Interference with Contracts and Prospective Business Relations)
### (Against All Defendants)

94.     Lotes incorporates and reasserts the allegations from all previous paragraphs of the Complaint.

95.     By their actions, Defendants have knowingly interfered with numerous continuing

business or customary relationships and with  existing contracts between Lotes and its customers – including, but not limited to, relationships and/or contracts with Compal, Quanta, and Inventec – in the manufacture and sale of USB 3.0 connectors.

96.      In interfering with Lotes' business relationships and contracts, Defendants acted with the sole purpose of harming Lotes and used dishonest, unfair, and improper means. Defendants' wrongful means include violating and circumventing the letter and spirit of the Adopters and Contributors, and the violation of U.S. antitrust laws.  Defendants' improper means also include filing patent enforcement actions in China, knowing that the Necessary Claims of the Asserted Patents either were validly licensed or that Defendants had an obligation to license the Necessary Claims of the Asserted Patents to Lotes.  New York law expressly recognizes civil lawsuits as an improper means of interfering with a party's contractual and business relationships.  The type of economic pressure being brought to bear by Defendants also amounts to improper means under the facts of this case.

97.      By their actions, Defendants have deceived USB-IF and knowingly injured the contractual and business relationships that Lotes has  with its supplies, associates, and  customers for the manufacture and sale of USB 3.0 connectors, by putting Lotes under a cloud of litigation in the filing of patent enforcement actions in China, knowing that the Necessary Claims for Defendants' Contributions in the Asserted Patents either were validly licensed or that Defendants had an obligation to license the Necessary Claims for Defendants' Contributions in the Asserted Patents to Lotes.

98.      Lotes has suffered injury to important contracts and business relationships and will continue to suffer damages in an undetermined amount to be proven at trial.

**FIFTH COUNT**
**(Declaratory Judgment that Lotes is Licensed**
**to Defendants' Necessary Claims)**
**(Against All Defendants)**

99.     Lotes incorporates and reasserts the allegations from all previous paragraphs of the Complaint.

100.     There is a substantial dispute between the parties concerning whether – to the extent that any of the alleged inventions described in and allegedly covered by valid patents claims owned by one or more Defendants and necessary to practice the USB 3.0 standard ("the Necessary Claims") are used, manufactured, or sold by or for Lotes, its suppliers, and/or its customers –  Lotes is licensed or, in the alternative, has an irrevocable right to a RAND-Zero license to the Necessary Claims by virtue of Defendants' RAND-Zero commitments under the Contributors Agreement, the Adopters Agreement and/or the Letter to USB-IF. There is also a substantial dispute concerning whether any Necessary Claims cover contributions made by one or more Defendants to the USB 3.0 specification.  Additionally, there is a dispute concerning whether Defendants must license any non-Necessary Claims relating to USB 3.0 connectors to Lotes on RAND terms.

101.     The disputes between the parties are substantial, reflect adverse legal interests, are capable of resolution by this Court, and are of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

102.     Lotes is entitled to a declaratory judgment that the patent claims in the Asserted Patents are Necessary Claims, Lotes is licensed to Defendants' Necessary Claims by virtue of Defendants' RAND-Zero commitments or, in the alternative, Lotes has an irrevocable right to be licensed on RAND-Zero terms under the Asserted Patents. Lotes is also entitled to a declaratory judgment that it is, or must be, licensed to non-Necessary Claims of any of Defendants' patents

relating to USB 3.0 connectors on RAND terms.

## SIXTH COUNT
### (Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1)
### (Against All Defendants)

103.     Lotes incorporates and reasserts the allegations of all previous paragraphs of this Complaint.

104.     Hon Hai and Foxconn have agreed, combined, conspired, and acted concertedly to unreasonably restrain trade and to prevent competition in the USB 3.0 connector market for notebook computers and for motherboards for desktops and servers in violation of § 1 of the Sherman Act (15 U.S.C. § 1).  Defendants' agreement, conspiracy, and concerted action is affecting interstate commerce within the United States.  Defendants have market power, as extensively discussed above, and their market power is likely to increase dramatically as a result of the concerted action that they have taken in restraint of trade.

105.     Defendants' agreement, conspiracy, and concerted action are shown by numerous facts, including Defendants' common representation and concerted action during the USB 3.0 specification adoption process, their common representation and concerted action during the licensing negotiation process, their uniformity and concerted action in failing to offer an actual license of Necessary Claims to Lotes, their uniformity and concerted action in bringing lawsuits against Lotes subsidiaries in China, and their uniformity and concerted action in defending this lawsuit.  On information and belief, each of the Defendants is a separate corporate entity.  On information and belief, Defendants Hon Hai and Foxconn are not wholly owned subsidiaries of each other and do not have a completely uniform and overlapping common directorship. These companies are directed independently and should be capable of independent decision-making and independent action.  Yet, they have acted in complete lockstep in the scheme to lure the

technological world into adopting a USB 3.0 specification that encompasses their favored technologies and then attacking actual competitors like Lotes in patent infringement lawsuits in China *for using the very technology that Defendants pushed the world to adopt.* If Defendants were not acting in concert, then one or more of the Defendants would have acted differently, in light of the fact that their concerted action is illegal.  Defendants' concerted activities deprive the economy of the independent actions and sources of control that a healthy economy assumes.

106.    In furtherance of the combination and conspiracy, Hon Hai and Foxconn have made false commitments to the USB-IF standards body promising to license any Necessary Claims on RAND-Zero terms, and by reneging on its RAND-Zero contractual obligations.  Hon Hai and Foxconn have undertaken this cumulative course of conduct with the intent to restrain trade and prevent competition in the USB 3.0 connector market for computer motherboards.

107.    Had Hon Hai and Foxconn properly disclosed their true intentions, namely , that the parties implementing the standard were not licensed and should be enjoined from selling USB 3.0 standard compliant products or pay other than RAND-Zero terms, USB-IF would likely have incorporated alternative technologies capable of performing the relevant functions into the standard.  Alternatively, USB-IF would have continued to leave the relevant functions out of the standard, in which case implementers would have been free to choose various competing technologies to perform the patented functions, and USB-IF would have been free to continue to evaluate competing alternative connector standards for future iterations of the USB 2.0 standard.

108.    The deceptions and fraud of Hon Hai and Foxconn have resulted in incorporation of their patents, including the Chinese patents at issue in China and the counterpart U.S. patents, into the USB 3.0 standard, over which the Defendants claim worldwide patent rights.  Hon Hai and Foxconn have, therefore, unlawfully excluded competing technologies from the USB 3.0

41

standard and unlawfully acquired monopoly power in the USB 3.0 connector market in the United States by choking-off supply in China, where the relevant factories of its competitors – including Lotes – are located, and from where these USB 3.0 connectors are incorporated into numerous computer products and peripheral devices for export into the United States.

109.    This conspiracy was undertaken by the Defendants with the express purpose and intent of restraining competition in the USB 3.0 connector market and excluding Lotes as a market competitor.  That purpose and intent can be inferred from all the circumstances, including the fact that Defendants' representative stopped licensing negotiations, and was never heard from again, following by the institution of improper lawsuits in China with the express purpose of destroying Lotes' USB 3.0 connector supply chain.

110.    The conduct by the Defendants substantially and adversely impacts competition in interstate commerce in the USB 3.0 connector market.  No valid business reason exists for the Defendants' actions.  Unless enjoined by this Court, the conduct by the Defendants will result in higher prices and elimination of choice in the USB 3.0 connector market.

111.    As a direct and proximate result of Defendants' illegal acts, and because Lotes is both a direct licensor and a direct competitor of the Defendants, Lotes has antitrust standing. Lotes has already suffered injury to its business and property, in an amount to be determined at trial, and is threatened by the imminent loss of customers and potential customers, and loss of goodwill.  Lotes will continue to suffer such injuries unless and until the Defendants concede that Lotes possesses all necessary licenses, drops their infringement suits, and ceases their *in terrorem* behavior.  Lotes has no adequate remedy at law for many of these injuries, and issuance of an injunction barring Defendants' illegal behavior is therefore warranted.

112.    Defendants' actions have caused and will continue to cause significant harm to

competition in the markets for USB 3.0 connector connectors in notebooks and other computer

motherboards.  Unless restrained by the Court, Defendants' antitrust conduct will continue to

harm competition in the relevant market by restricting output and raising prices on computer

devices and peripherals communicating over USB 3.0 connectors.  Lotes is also requesting

damages in an amount to be determined at trial.

### SEVENTH COUNT
**(Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2)**
**(Against All Defendants)**

113.     Lotes incorporates and reasserts the allegations of all previous paragraphs of this

Complaint.

114.     Hon Hai and Foxconn have each acted in their individual capacities with the

specific intent to monopolize and have attempted to monopolize the USB 3.0 connector markets

for notebook computers and for motherboards for desktops and servers in violation of § 2 of the

Sherman Act (15 U.S.C. § 2).

115.     Hon Hai and Foxconn have each made false commitments to the USB-IF

standards body promising to license IPR on RAND-Zero, and by reneging on its RAND-Zero

contractual obligations.  Defendants have undertaken this course of conduct with the intent to

monopolize the markets for USB 3.0 connectors in notebooks and other computer motherboards.

116.     The Defendants' individual and joint conduct substantially and adversely impacts

competition in interstate commerce in the USB 3.0 connector market.  No valid business reason

exists for the Defendants' actions.  Unless enjoined by this Court, the conduct by the Defendants

will result in higher prices and elimination of choice in the USB 3.0 connector market.

117.     Defendants manufacture a variety of products for brands like Apple, Dell,

Hewlett-Packard, Motorola, Nintendo, Sony and Nokia, to name a few, for import into the

United States.  The Defendants' individual and joint behavior is intended to drive Lotes and all similarly situated competitors out of the market.  Should the Chinese tribunals agree to let the Defendants enforce their patent rights to shutter Lotes' Chinese production facilities, and should this Court not act to contravene such enforcement and closure, there is a dangerous likelihood that Defendants will come to monopolize the U.S. market.  Defendants are thus liable for attempted monopolization of the USB 3.0 connector market in notebook motherboards.

118.    As a direct and proximate result of Defendants' illegal acts, and because Lotes is both a direct licensor and a direct competitor of the Defendants, Lotes has antitrust standing. Lotes has already suffered injury to its business and property, in an amount currently unascertained, and is threatened by the imminent loss of customers and potential customers, and loss of goodwill.  Lotes will continue to suffer such injuries unless and until the Defendants concede that Lotes possesses all necessary licenses, drops their infringement suits, and ceases their *in terrorem* behavior.  Lotes has no adequate remedy at law for many of these injuries

119.    Defendants' actions have caused and will continue to cause significant harm to competition in the USB 3.0 connector market.  Unless restrained by the Court, the antitrust conduct of the Defendants will continue to harm competition in the relevant markets by restricting output and raising prices on computer motherboards communicating over USB 3.0 connectors.  Lotes is also requesting that the Court award it compensatory damages for an amount to be determined at trial.

//

//

//

//

//

## PRAYER FOR RELIEF

Wherefore, Lotes respectfully requests that judgment be entered in its favor and against Defendants Hon Hai, Foxconn International CI, Foxconn International USA, Foxconn Electronics and Foxconn Kunshan, and that the Court grant Lotes the following relief:

A.     Adjudge and decree that Defendants are liable for breach of contract;

B.     Adjudge and decree that Defendants are liable for promissory estoppel;

C.     Adjudge and decree that Defendants are liable for tortious interference with contracts and prospective economic relations;

D.     Adjudge and decree that Defendants have violated Sections 1 and/or 2 of the Sherman Act, 15 U.S.C. §§ 1, 2;

E.     Enter judgment awarding Lotes all damages allowed under any of its legal theories as proven at trial;

F.     Enter judgment awarding Lotes its expenses, costs, and attorneys' fees in accordance with Rule 54(d) of the Federal Rules of Civil Procedure;

G.     Enter judgment for trebling of compensatory damages under the Sixth and Seventh Counts pursuant to 15 U.S.C. § 15;

H.     Enter judgment awarding Lotes punitive damages to the extent allowable at law;

I.     Enter judgment awarding Lotes prejudgment and post-judgment interests to the extent allowable under the law.

J.     Enjoin Defendants and their officers, agents, servants, employees, affiliates, and all those acting in privity or concert with them from engaging in any further unlawful and exclusionary acts as herein alleged, including, but not limited to, an

injunction stopping world-wide enforcement against Lotes of all patents owned by Defendants with claims that read on the USB 3.0 standard;

K.      Decree that all patents owned by one or more Defendants and necessary to practice the USB 3.0 standard are not to be asserted against the USB-IF and the members, Adopters, and Contributors of that body, including Lotes;

L.      Decree that, to the extent any valid patents owned by one or more Defendants and necessary to practice the USB 3.0 standard are used, manufactured, or sold by Lotes, its suppliers, distributors and/or customers, Lotes is licensed by virtue of Defendants' RAND-Zero commitments or, in the alternative, that Lotes has an irrevocable right to be licensed world-wide on RAND-Zero terms under those patents and a right to be licensed even under non-Necessary Claims on a RAND basis, as Defendants represented;

M.      Decree that Lotes is entitled to license on RAND-Zero terms from Defendants any and all Necessary Claims of valid patents owned by one or more Defendants, and all other claims on RAND terms, and specifically order that Defendants license those patents to Lotes;

N.      Decree that Defendants have through their statements and actions waived their rights to enforce against Lotes, or to receive any royalties from Lotes, for Necessary Claims of any patents covering the USB 3.0 standard filed anywhere in the world.

O.      Decree that this case is an exceptional case and award Lotes its reasonable attorneys' fees, costs, and expenses pursuant to 35 U.S.C. § 285 and 15 U.S.C. § 15; and

P.      Grant such other and further relief as it may deem just and proper.


## DEMAND FOR JURY TRIAL

Pursuant to Fed. R. Civ. P. 38, Plaintiff Lotes demands a trial by jury of all issues so triable.

Respectfully Submitted,

Dated:  December 21, 2012

Nicolas S. Gikkas (*Pro Hac Vice*)
The Gikkas Law Firm
P.O. Box 2247
Saratoga, California 95070-0247
Telephone: 408.868.7726
Facsimile:  408.877.1516
nsg@gikkaslaw.com

Lewis E. Hudnell, III (LH 9718)
Colvin Hudnell LLP
375 Park Avenue
Suite 2607
New York, New York 10152
Telephone: 347.855.4772
Facsimile: 347.772.3034
lewis@colvinhudnell.com

Attorneys for Plaintiff
LOTES CO., LTD.