UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------X

LOTES CO., LTD.,

           **Plaintiff,**

    **- against -**

HON HAI PRECISION INDUSTRY CO.
LTD.; FOXCONN INTERNATIONAL
HOLDINGS, LTD.; FOXCONN
INTERNATIONAL, INC.; FOXCONN
ELECTRONICS, INC.; and FOXCONN
(KUNSHAN) COMPUTER CONNECTOR
CO., LTD.,

           **Defendants.**
-------------------------------------------------------X

**OPINION AND ORDER**

**12 Civ. 7465 (SAS)**



**SHIRA A. SCHEINDLIN, U.S.D.J.:**

        Lotes Co., Ltd. ("Lotes" or "plaintiff") has brought suit against Hon

Hai Precision Industry Co. Ltd. ("Hon Hai"), Foxconn International Holdings, Inc.

("Foxconn IH"), Foxconn International, Inc. ("Foxconn International") , Foxconn

Electronics, Inc. ("Foxconn Electronics") and Foxconn (Kunshan) Computer

Connector Co., Ltd. ("Foxconn Kunshan").[1] Lotes alleges violations of sections

one and two of the Sherman Act.[2] Lotes also brings claims for breach of contract,

promissory estoppel, waiver, tortious interference with contract, and declaratory

---

[1]     Foxconn Kunshan has not been served to date.

[2]     *See* 15 U.S.C. §§ 1, 2.

judgment.  Defendants Hon Hai, Foxconn IH, Foxconn International and Foxconn Electronics (collectively, the "defendants") move to dismiss the First Amended Complaint ("FAC") in its entirety pursuant to Federal Rule of Civil Procedure 12(b)(6).[3]  For the following reasons, defendants' motion is granted.

## I.     BACKGROUND

### A.     The USB 3.0 Standard

Universal Serial Bus ("USB") connectors are used primarily to connect computer peripherals, such as hard drives, printers and keyboards, to personal computers, smart phones and other electronic devices.[4]  The USB 3.0 is the latest generation of USB connectors.[5]  A "standard" is basically a common set of technological specifications to be used industry-wide with regard to a particular technology.  "A standard, by definition, eliminates alternative technologies."[6]  "To facilitate interoperability among chipmakers, device makers, and computer makers, among others, companies participate in the development of technical standards that

---

[3]     *See* Docket Entry # 28.  Foxconn International Holdings, Inc., which was served on February 14, 2013, has joined in the motion to dismiss.  *See* Docket Entry # 40.

[4]     *See* FAC ¶ 16.

[5]     *See id.*

[6]     *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 314 (3d Cir. 2007).

establish precise specifications for the interfaces, such as [USB] connectors, between devices."[7]  Standards often incorporate patented technology and other proprietary intellectual property ("IP") rights.[8]

Standards are typically established by private standard-setting organizations ("SSOs").  The SSO governing USB standards is the USB Implementers Forum, Inc. ("USB-IF").[9]  The USB-IF vetted and incorporated the patents and other IP included in the USB 3.0 Standard.[10]  By incorporating proprietary IP rights into an industry-wide standard, the USB-IF weighed "significant pro-competitive benefits with significant anti-competitive risks."[11] "On the pro-competitive side, standards have the potential to encourage innovation and promote competition."[12]  "On the anti-competitive side, technical standardization also creates a 'lock-in' effect and a risk of 'patent hold-up.'"[13] Patent hold-up has been explained by the Third Circuit as follows:

---

[7]      FAC ¶ 25.

[8]      *See id.* ¶ 28.

[9]      *See id.* ¶ 18.

[10]     *See id.*

[11]     *Id.* ¶ 26.

[12]     *Id.* ¶ 27.

[13]     *Id.* ¶ 28.

> Inefficiency may be injected into the standard-setting process by what is known as "patent hold-up." An SDO [standards-determining organization] may complete its lengthy process of evaluating technologies and adopting a new standard, only to discover that certain technologies essential to implementing the standard are patented. When this occurs, the patent holder is in a position to "hold up" industry participants from implementing the standard. Industry participants who have invested significant resources developing products and technologies that conform to the standard will find it prohibitively expensive to abandon their investment and switch to another standard. They will have become "locked in" to the standard. In this unique position of bargaining power, the patent holder may be able to extract supracompetitive royalties from the industry participants.[14]

Thus, '[i]n the absence of an agreement between a contributor and an SSO, the possessors of such proprietary IP rights could demand exorbitant terms from their licensees – or even refuse to license their rights altogether."[15]  Consequently, SSOs typically secure agreements wherein the technology-contributing parties agree to license all incorporated technology on reasonable and non-discriminatory ("RAND") terms as a necessary condition for adoption of a particular standard.[16] "RAND licenses are thus central to the viability of an SSO and the standards it

---

[14]     *Broadcom*, 501 F.3d at 300.

[15]     FAC ¶ 28.

[16]     *See id.* ¶ 29.

4

promulgates."[17]

To ensure that the USB 3.0 Standard remains pro-competitive, contributing parties otherwise known as "Contributors" must sign the USB 3.0 Contributors Agreement (the "Contributors Agreement").[18]  Defendants executed the same Contributors Agreement signed by Lotes on December 11, 2007.[19] Section 3.4 of the Contributors Agreement, entitled "Limited Patent Licensing Obligations in Contributions," obligates defendants to grant to any "Adopter" a "non-exclusive world-wide license under any Necessary claim of a patent or patent application . . .  on a royalty-free basis and under otherwise reasonable and non-discriminatory ('RAND-Zero') terms . . . ."[20]  Lotes is an Adopter given that it signed the USB 3.0 Adopters Agreement (the "Adopters Agreement"[21]) within the required Adoption Period.[22]  Defendants executed the same Adopters Agreement signed by Lotes.[23]  Accordingly, "[d]efendants, like Lotes, are therefore both

---

[17]    *Id.* ¶ 30.

[18]    *See* Contributors Agreement, Ex. A to the FAC.

[19]    *See* FAC ¶ 38.

[20]    Contributors Agreement § 3.4.

[21]    *See* Adopters Agreement, Ex. A-1 to the FAC.

[22]    *See* FAC ¶ 39.

[23]    *See id.*

'Contributors' and 'Adopters' of the USB 3.0 Standard and are therefore bound by the terms of the USB-IF Contributors Agreement and Adopters Agreement . . . ."[24] The USB-IF thereby represents to Adopters that it has secured royalty-free licenses for all patents and other IP needed to practice the USB 3.0 Standard.[25]

### B.    The Dispute

Lotes is a Chinese corporation as are defendants Hon Hai and Foxconn Kunshan.[26]  Lotes competes directly with defendants in making and selling USB 3.0 connectors.[27]  Because USB connectors are incorporated into other components and products, companies that manufacture them "typically sell directly to notebook manufacturers and to companies making motherboards for servers and desktops."[28] As a result, "both Lotes and the Defendants directly compete for market share in the markets for USB 3.0 connectors for notebooks, desktops, and servers by selling to the following ODMs [original design manufacturers] who

---

[24]    *Id.*

[25]    *See id.* ¶ 31 ("When Lotes accepted the terms of the USB-IF's Adopters Agreement, the USB-IF explicitly granted Lotes' RAND-Zero licenses on all 'Necessary Claims'. . . .").

[26]    *See id.* ¶¶ 1-2.

[27]    *See id.* ¶ 16.  *See also id.* ¶ 21 ("Lotes and the Defendants are thus all competitors in both the global and U.S. markets for supplying USB 3.0 connectors into notebooks and motherboards for desktops and servers.").

[28]    *Id.* ¶ 19.

make and assemble computer products [in China] for many well-known brands."[29]

Lotes has made repeated good faith attempts to negotiate with Hon Hai regarding the RAND-Zero licensing terms set forth in the Contributors Agreement and Adopters Agreement.[30]  Hon Hai has steadfastly refused to license certain USB 3.0 Standard patents to Lotes despite its efforts.[31]  Instead, Foxconn Kunshan brought two patent infringement suits in China against two Lotes subsidiaries in order to enjoin Lotes from making and selling certain USB 3.0 connectors.[32]  In the first patent proceeding, Foxconn Kunshan asserted two Chinese patents, the "608.0 patent" and the "623.1 patent," against Lotes SuZhou, a Lotes subsidiary located in eastern China.[33]  Foxconn Kunshan initiated a second patent enforcement proceeding asserting the same two patents against Lotes GuangZhou, a Lotes subsidiary located in southern China.[34]  According to Lotes, "the asserted claims of the '608.0 patent and the '623.1 patent are 'Necessary

---

[29]     *Id.* ¶ 22.  "An ODM designs and manufactures a specified product which is branded by another company."  *Id.* ¶ 33.

[30]     *See id.* ¶¶ 42, 45.

[31]     *See id.*

[32]     *See id.* ¶¶ 45, 53.

[33]     *See id.* ¶ 53.

[34]     *See id.* ¶ 57.

Claims' and 'Contributions' as defined by the Contributors Agreement, which were contributed by at least one of the Foxconn Defendants and/or Hon Hai."[35] Thus, plaintiff argues that "the claims being asserted in China are Necessary Claims as defined in the Contributors Agreement and Adopters Agreement signed by Defendants and must be licensed to Lotes on RAND-zero terms."[36]  Only two USB 3.0 connectors were specifically named in the patent enforcement proceedings brought by Foxconn Kunshan.[37]  Foxconn Kunshan did not challenge the eleven other USB 3.0 connectors manufactured by Lotes in China.[38]

### C.    Anti-competitive Allegations

No party in the instant action is alleged to manufacture or directly sell any USB 3.0 connectors in the United States.  Notwithstanding this lack of domestic activity, plaintiff claims that defendants' conduct is causing cognizable antitrust injury in the United States.

---

[35]    *Id.* ¶ 62.

[36]    *Id.* ¶ 54.  *See also id.* ¶ 63 ("Because Hon Hai and Foxconn Kunshan are 'Contributors,' Lotes is an 'Adopter,' and the asserted patent claims are 'Necessary Claims' under the Contributors Agreement and Adopters Agreement, the Defendants are obligated to grant Lotes a RAND-Zero license to the Asserted Patents, or at the very least to the asserted claims, per the explicit terms of those governing agreements.").

[37]    *See id.* ¶ 58.

[38]    *See id.* ¶ 61.

> The relevant markets for assessing Defendants' antitrust conduct include those for USB 3.0 connectors and are the markets for USB 3.0 connectors suitable for integration into motherboards powering notebooks, desktop computers and servers. . . . Defendants are wrongfully using their foreign patents to raise prices and exclude competition in the USB 3.0 connector market in the United States. Defendants acquired this power as a result of misrepresentations to the USB-IF during the standards-setting process and/or a refusal to adhere to the obligations that they undertook to the USB-IF and its adopters (including Lotes).[39]

Plaintiff alleges that "[d]efendants' anticompetitive behavior is designed either to foreclose Lotes from several relevant competitive markets or to raise Lotes' costs in those markets to the point that Lotes becomes uncompetitive and Defendants become a monopoly, which is their professed intention."[40] According to plaintiff, "[a]nything that affects the price, quantity, or competitive nature of the production market for USB 3.0 connectors will therefore have a direct, substantial, and reasonably foreseeable effect on U.S. commerce in precisely the ways that the antitrust laws were created to prevent."[41] Arguably, then, the patent enforcement proceedings against Lotes SuZhou and Lotes GuangZhou "threaten a potentially significant decrease in competition in the

---

[39]  *Id.* ¶ 65.

[40]  *Id.* ¶ 19.

[41]  *Id.* ¶ 47.

United States markets for: USB 3.0 connectors; motherboards containing USB 3.0 connectors; and notebooks containing USB 3.0 connectors."[42]  In sum, plaintiff claims that "Defendants' willingness to bring suit against Lotes in contravention of the USB-IF RAND-Zero terms has an *in terrorem* effect capable of curbing competitive manufacture and raising prices to U.S. consumers *across the full range of products incorporating USB 3.0 connectors*.[43]

## II.   LEGAL STANDARDS

### A.   Motion to Dismiss

In deciding a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the court evaluates the sufficiency of the complaint under the "two-pronged approach" suggested by the Supreme Court in *Ashcroft v. Iqbal*.[44] First, a court "'can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth.'"[45] "Threadbare recitals of the elements of a cause of action, supported by mere

---

[42]     *Id.* ¶ 69.

[43]     *Id.* ¶ 71 (second emphasis added).

[44]     556 U.S. 662 (2009).

[45]     *Hayden v. Paterson*, 594 F.3d 150, 161 (2d Cir. 2010) (quoting *Iqbal*, 556 U.S. at 679).  *Accord Ruston v. Town Bd. for Town of Skaneateles*, 610 F.3d 55, 59 (2d Cir. 2010).

conclusory statements, do not suffice" to withstand a motion to dismiss.[46]  Second, "[w]hen there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief."[47]

　　　　To survive a Rule 12(b)(6) motion to dismiss, the allegations in a complaint must meet a standard of "plausibility."[48]  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."[49] Plausibility "is not akin to a probability requirement;" rather, plausibility requires "more than a sheer possibility that a defendant has acted unlawfully."[50]

　　　　"In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents

---

[46]　　*Iqbal*, 556 U.S. at 678 (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)).

[47]　　*Id.* at 679.  *Accord Kiobel v. Royal Dutch Petroleum Co.*, 621 F.3d 111, 124 (2d Cir. 2010).

[48]　　*Twombly*, 550 U.S. at 564.

[49]　　*Iqbal*, 556 U.S. at 678 (quotation marks omitted).

[50]　　*Id.* (quotation marks omitted).

11

incorporated by reference in the complaint."[51]  However, the court may also

consider a document that is not incorporated by reference, "where the complaint

'relies heavily upon its terms and effect,' thereby rendering the document 'integral'

to the complaint."[52]

### B.    Subject Matter Jurisdiction

Federal Rule of Civil Procedure 12(b)(1) provides for the dismissal of

a claim when a federal court lacks subject matter jurisdiction – "the statutory or

constitutional power to adjudicate [the claim]."[53]  A federal court has an

independent duty to determine that it has subject matter jurisdiction and may raise

the issue *sua sponte*.[54]  The proponent of jurisdiction (typically the plaintiff) bears

the burden of establishing subject matter jurisdiction by a preponderance of the

---

[51]    *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010)
(citing *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 153 (2d Cir. 2002)).

[52]    *Id.* (quoting *Mangiafico v. Blumenthal*, 471 F.3d 391, 398 (2d Cir.
2006)).  *Accord Global Network Commc'ns, Inc. v. City of N.Y.*, 458 F.3d 150, 156
(2d Cir. 2006).

[53]    *Diagnostic Cardioline Monitoring of N.Y., Inc. v. Leavitt*, 171 Fed.
App'x 374, 375 (2d Cir. 2006).

[54]    *See* Federal Rule Civil Procedure 12(h)(3) ("Whenever it appears by
suggestion of the parties or otherwise that the court lacks jurisdiction of the subject
matter, the court shall dismiss the action.").  *Accord Kontrick v. Ryan*, 540 U.S.
443, 455 (2004).  Accordingly, this Court can address the jurisdictional inquiry,
which has been briefed by the parties, even though defendants' motion to dismiss
was brought under Federal Rule of Civil Procedure 12(b)(6) rather than 12(b)(1).

evidence.[55]

In considering a motion to dismiss for lack of subject matter jurisdiction, "'the court must take all facts alleged in the complaint as true and draw all reasonable inferences in favor of plaintiff.'"[56]  However, "'jurisdiction must be shown affirmatively, and that showing is not made by drawing from the pleadings inferences favorable to the party asserting it.'"[57]  In fact, "where jurisdictional facts are placed in dispute, the court has the power and obligation to decide issues of fact by reference to evidence outside the pleadings, such as affidavits."[58]  "In deciding the motion, the court 'may consider affidavits and other materials beyond the pleadings to resolve the jurisdictional issue, but [it] may not

---

[55]    *See Luckett v. Bure*, 290 F.3d 493, 497 (2d Cir. 2002).  *See also Goonewardena v. New York*, No. 05 Civ. 8554, 2007 WL 510097, at *6 (S.D.N.Y. Feb. 14, 2007) ("[T]he burden of demonstrating that the court has subject matter jurisdiction over the case falls on the plaintiff[,] as it is the plaintiff who seeks to invoke the court's jurisdiction.").

[56]    *Natural Res. Def. Council v. Johnson*, 461 F.3d 164, 171 (2d Cir. 2006) (quoting *Sweet v. Sheahan*, 235 F.3d 80, 83 (2d Cir. 2000)).

[57]    *APWU v. Potter*, 343 F.3d 619, 623 (2d Cir. 2003) (quoting *Shipping Fin. Servs. Corp. v. Drakos*, 140 F.3d 129, 131 (2d Cir. 1998)).  *Accord London v. Polishbook*, 189 F.3d 196, 199 (2d Cir. 1999) ("[I]t is the affirmative burden of the party invoking [federal subject matter] jurisdiction . . . to proffer the necessary factual predicate – not just an allegation in a complaint – to support jurisdiction.").

[58]    *LeBlanc v. Cleveland*, 198 F.3d 353, 356 (2d Cir. 1999).

rely on conclusory or hearsay statements contained in the affidavits.'"[59]

## C.     The Sherman Act

Section 1 of the Sherman Act states: "Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal."[60] "'[T]he three required elements of an antitrust claim [are] (1) a violation of antitrust law; (2) injury and causation; and (3) damages . . . .'"[61] Thus, "to prove a Section 1 violation of the Sherman Act, a plaintiff must show 'a combination or some form of concerted action between at least two legally distinct economic entities' that 'constituted an unreasonable restraint of trade either per se or under the rule of reason.'"[62]

---

[59]     *Mosdos Chofetz Claim, Inc. v. Village of Wesley Hills*, 701 F. Supp. 2d 568, 580–81 (S.D.N.Y. 2010) (alteration in original) (quoting *J.S. ex rel. N.S. v. Attica Cent. Sch.*, 386 F.3d 107, 110 (2d Cir. 2004)).

[60]     15 U.S.C. § 1.

[61]     *Cordes & Co. Fin. Servs., Inc. v. A.G. Edwards & Sons, Inc.*, 502 F.3d 91, 105 (2d Cir. 2007) (quoting *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 136 (2d Cir. 2001) (alterations in original)).

[62]     *Pepsico, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 109 (2d Cir. 2002) (quoting *Primetime 24 Joint Venture v. National Broad. Co.*, 219 F.3d 92, 103 (2d Cir. 2000) (internal quotation marks and citation omitted)).

Section 2 of the Sherman Act states: "Every person who shall monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States, or with foreign nations, shall be deemed guilty of a felony . . . ."[63] "[I]n order to state a claim for monopolization under Section 2 of the Sherman Act, a plaintiff must establish '(1) the possession of monopoly power in the relevant market and (2) the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior product, business acumen, or historic accident.'"[64] "To state an attempted monopolization claim, a plaintiff must establish '(1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power.'"[65]

> The core element of a monopolization claim is market power, which is defined as the ability to raise price[s] by restricting output. The more competition a company faces, the less it can control prices because competitors will undercut its prices to secure market share. Conversely, a company that can exclude competition can sustain its

---

[63]    15 U.S.C. § 2.

[64]    *Pepsico,* 315 F.3d at 105 (quoting *United States v. Grinnell Corp.*, 384 U.S. 563, 570-71 (1966)).

[65]    Id. (quoting *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447, 456 (1993)).

ability to control prices and thereby maintain its market power.  The pertinent inquiry in a monopolization claim, then, is whether the defendant has engaged in improper conduct that has or is likely to have the effect of controlling prices or excluding competition, thus creating or maintaining market power.[66]

## III.   DISCUSSION

### A.   Anti-competitive Conduct

At this stage of the litigation, I must accept as true plaintiff's allegation that defendants' alleged misconduct was facilitated by "misrepresentations [made] to the USB-IF during the standards-setting process . . . ."[67]  "[C]onduct that undermines the procompetitive benefits of private standard setting may, at least in some circumstances, be deemed anticompetitive under antitrust law."[68]

Anticompetitive conduct may take a variety of forms, but it is generally defined as conduct to obtain or maintain monopoly power as a result of competition on some basis other than the merits.   Conduct that impairs the

---

[66]   *Id.* at 107-08 (footnote, quotation marks and citations omitted).

[67]   FAC ¶ 65.

[68]   *Broadcom*, 501 F.3d at 310.  *Accord Indian Head, Inc. v. Allied Tube & Conduit Corp.*, 817 F.2d 938, 933-34 (2d Cir. 1987) (citing *American Soc'y of Mechanical Eng'rs, Inc. v. Hydrolevel Corp.*, 456 U.S. 556, 571 (1982) (stating that standard-setting organizations may "be rife with opportunities for anticompetitive behavior")), *aff'd*, *Allied Tube & Conduit Corp. v. Indian Head, Inc.*, 486 U.S. 492 (1988).

opportunities of rivals and either does not further competition on the merits or does so in an unnecessarily restrictive way may be deemed anticompetitive. Conduct that merely harms competitors, however, while not harming the competitive process itself, is not anticompetitive.[69]

Thus, "[d]eception in a consensus-driven private standard-setting environment harms the competitive process by obscuring the costs of including proprietary technology in a standard and increasing the likelihood that patent rights will confer monopoly power on the patent holder."[70]  Accordingly, for purposes of this motion, I must assume that defendants engaged in anti-competitive conduct.[71]  The next question, then, is whether defendants' conduct falls within the purview of the

---

[69]     *Id.* at 308 (citations omitted).

[70]     *Id.* at 314 (holding that "(1) in a consensus-oriented private standard-setting environment, (2) a patent holder's intentionally false promise to license essential proprietary technology on FRAND [fair, reasonable and nondiscriminatory] terms, (3) coupled with an SDO's reliance on that promise when including the technology in a standard, and (4) the patent holder's subsequent breach of that promise, is actionable anticompetitive conduct").

[71]     This deception on the SSO theory of anti-competitive conduct is subject to the heightened pleading standards for fraud imposed by Federal Rule of Civil Procedure 9(b).  *See Apple Inc. v. Samsung Elecs. Co., Ltd.*, No. 11-CV-01846, 2012 WL 1672493, at * 7 (N.D. Cal. May 14, 2012).  To satisfy Rule 9(b), Lotes must allege specific facts as to when the false RAND declarations were made, by whom, and for which patents.  *See id.*  Because Lotes has failed to do so, its SSO deception theory is unavailing.  It is, however, of no moment whether the anti-competitive conduct in dispute is deception of an SSO, refusing to grant a RAND-Zero license, or the filing of vexatious patent enforcement proceedings.  As the following section will make clear, defendants' anti-competitive conduct is not subject to the Sherman Act no matter what form it takes.

Sherman Act.

**B.     The Foreign Trade Antitrust Improvements Act ("FTAIA")**

**1.     In General**

"The Foreign Trade Antitrust Improvements Act of 1982 (FTAIA) excludes from the Sherman Act's reach much anticompetitive conduct that causes only foreign injury.  It does so by setting forth a general rule stating that the Sherman Act 'shall not apply to conduct involving trade or commerce . . . with foreign nations.'"[72] The FTAIA then creates exceptions to this general rule where foreign conduct significantly harms domestic commerce.[73]  The FTAIA states:

> Sections 1 to 7 of this title [the Sherman Act] shall not apply to conduct involving trade or commerce (other than import trade or import commerce) with foreign nations unless –
>
>> (1) such conduct has a direct, substantial, and reasonably foreseeable effect –
>>
>>> (A) on trade or commerce which is not trade or commerce with foreign nations, or on import trade or import commerce with foreign nations; or
>>>
>>> (B) on export trade or export commerce with foreign nations, of a person engaged in such trade or commerce in the United States; and

---

[72]     *F. Hoffman-La Roche Ltd. v. Empagran S.A.*, 542 U.S. 155, 158 (2004) (quoting 96 Stat. 1246, 15 U.S.C. § 6a).

[73]     *See id.*

> (2) such effect gives rise to a claim under the provisions of sections 1 to 7 of this title, other than this section.[74]

Thus, the "domestic-injury exception" to the FTAIA's foreign injury rule applies, and makes the Sherman Act applicable, where the conduct in issue both: "(1) sufficiently affects American commerce, *i.e.*, it has a 'direct, substantial, and reasonably foreseeable effect' on American domestic, import, or (certain) export commerce, *and* (2) has an effect of a kind that antitrust law considers harmful, *i.e.*, the 'effect' must 'giv[e] rise to a [Sherman Act] claim.'"[75]

### 2.    Is the FTAIA Jurisdictional?

There appears to be a circuit split as to whether the FTAIA is jurisdictional or whether it sets forth an additional element of an antitrust claim. For example, in *Animal Science Products, Inc. v. China Minmetals Corporation*, the Third Circuit held that the FTAIA "imposes a substantive merits limitation rather than a jurisdictional bar."[76]  In so holding, the court analyzed "whether, in enacting the FTAIA, Congress legislated pursuant to its Commerce Clause authority to articulate substantive elements that a plaintiff must satisfy to assert a

---

[74]    15 U.S.C. § 6a.

[75]    *Hoffman-La Roche*, 542 U.S. at 162 (quoting 15 U.S.C. § 6a(1), (2)) (emphasis and alteration in original)).

[76]    654 F.3d 462, 466 (3d Cir. 2011).

meritorious claim for antitrust relief or whether Congress acted pursuant to its Article III powers to define the jurisdiction of the federal courts."[77]  In its analysis, the court noted that the "FTAIA neither speaks in jurisdictional terms nor refers in any way to the jurisdiction of the district courts."[78]  The court concluded that "the FTAIA's language must be interpreted as imposing a substantive merits limitation rather than a jurisdictional bar."[79]  The Seventh Circuit similarly analyzed the language of the FTAIA and found that the word "jurisdiction" is nowhere to be found.[80]  The court also noted that "the Supreme Court has emphasized the need to draw a careful line between true jurisdictional limitations and other types of rules."[81]  The court relied on *Morrison v. National Australia Bank Ltd.* to conclude that "the FTAIA sets forth an element of an antitrust claim, not a jurisdictional limit on the power of the federal courts."[82]

---

[77]     *Id.* at 467.

[78]     *Id.* at 468.

[79]     *Id.* at 468-69.

[80]     *See Minn-Chem, Inc. v. Agrium Inc.*, 683 F.3d 845, 852 (7th Cir. 2012) ("The FTAIA, however, never comes close to using the word 'jurisdiction' or any commonly accepted synonym.  Instead, it speaks of the 'conduct' to which the Sherman Act . . . applies.  This is the language of elements, not jurisdiction.").

[81]     *Id.* at 851 (citing *Morrison v. National Australia Bank Ltd.*, 130 S. Ct. 2869 (2010)).

[82]     *Id.* at 852.

Other courts have taken a different view.  For example, in *United States v. LSL Biotechnologies*, the Ninth Circuit held that the "FTAIA provides the standard for establishing when subject matter jurisdiction exists over a foreign restraint of trade."[83]  And in *Filitech S.A. v. France Telecom S.A.*, the Second Circuit held that "the FTAIA forbids the exercise of jurisdiction over Sherman Act violations relating to foreign trade or commerce, other than import trade or commerce, unless the conduct complained of has a 'direct, substantial, and reasonably foreseeable effect' on domestic or import commerce."[84]

Lower courts within the Second Circuit that have considered the jurisdictional issue have cast doubt on the continued viability of the holding in *Filitech*.  As stated by the Honorable Gerard E. Lynch:

> Although the Second Circuit in *Filetech* characterized the FTAIA's limitations as a constraint on courts' "jurisdiction," 157 F.3d at 931, the express language of the FTAIA– *i.e.*, that the Sherman Act "shall not apply" to certain kinds of foreign conduct – suggests a limitation, not on a court's power to decide the case, but rather, on the substantive applicability of the statute. Although the Supreme Court has not decided this issue, . . ., the Court in another context has recently cautioned against the "profligate" use of jurisdictional terminology when discussing potential defects in a plaintiff's claim. *Arbaugh v. Y & H Corp.*, 546 U.S. 500, 510 (2006). *Arbaugh*

---

[83]    379 F.3d 672, 683 (9th Cir. 2004).

[84]    157 F.3d 922, 931 (2d Cir. 1998) (quoting 15 U.S.C. § 6a(1)(A)).

> highlighted the tendency of courts to term the non-existence of a critical fact a "jurisdictional defect" rather than merely the failure to prove an element of the claim – so called "drive-by jurisdictional rulings." *Id.* at 511. . . . *Arbaugh* held that "when Congress does not rank a statutory limitation on coverage as jurisdictional, courts should treat the restriction as nonjurisdictional in character." 546 U.S. at 516.  Because nothing in the statutory language of the FTAIA indicates that its limitations are jurisdictional, *Arbaugh* may require that the Second Circuit review its treatment of that issue.[85]

Although not deciding the jurisdictional issue, another court more recently noted that "[s]ince *Morrison*, however, the Second Circuit has not opined on whether the FTAIA is jurisdictional."[86]  Thus, while current thinking may point against finding the FTAIA to be jurisdictional, this Court is bound by precedent until it is overruled by the Second Circuit or the Supreme Court.[87]  Therefore, for purposes of this motion, the FTAIA is deemed to be a jurisdiction-defining statute.

---

[85]    *Boyd v. AWB Limited*, 544 F. Supp. 2d 236, 243 n.6 (S.D.N.Y. 2008) (parallel citations omitted).

[86]    *In re Vitamin C Antitrust Litig.*, Nos. 06-MD-1738, 05-CV-0453, 2012 WL 5839303, at *3 (E.D.N.Y. Nov. 16, 2012) ("Even post-*Morrison*, courts in the Second Circuit have continued to discuss the FTAIA in subject matter jurisdiction terms.").

[87]    *See Boyd*, 544 F. Supp. 2d at 243 n.6.

### 3.    Application of the FTAIA

Having established the FTAIA as jurisdictional, the next question is whether the offending conduct has a "direct, substantial, and reasonably foreseeable effect" on domestic commerce.  Borrowing from the Foreign Sovereign Immunities Act, "the Supreme Court unanimously declared that an effect is 'direct' if it follows as an immediate consequence of the defendant's activity."[88]  This definition is adopted for purposes of the FTAIA.  Defendants' conduct in refusing to issue Lotes RAND-Zero licenses and pursuing patent enforcement proceedings in China courts has neither a direct, substantial nor reasonably foreseeable effect on domestic commerce.  As succinctly summarized by defendants:

> Despite Plaintiff's desperate attempt to connect foreign conduct and effects to the United States, the fact remains that the alleged conduct, taking Plaintiff's allegations as true, is connected to the United States only through a long and convoluted series of transactions and manufacturing steps: Plaintiff and other USB 3.0 connector manufacturers supply the USB 3.0 connector products to various manufacturers of motherboards in China, which incorporate the connectors into their motherboards *in China*.  These motherboards are sold to original design manufacturers ("ODM") *in China* that manufacture the finished goods for brands such as Dell and HP *in China*.  Only then are these finished goods shipped to the United States for distribution.

---

[88]    *LSL Biotechnologies*, 379 F.3d at 680 (citing *Republic of Argentina v. Weltover, Inc.*, 504 U.S. 607, 618 (1992)).

> Such "ripple effects" on markets in the United States are insufficient to allow application of the Sherman Act under the standards articulated in the FTAIA.[89]

There is, therefore, a disconnect between the relevant (foreign) market as defined by plaintiff[90] (USB 3.0 connectors) –  the market which defendants are allegedly attempting to monopolize – and the U.S. market supposedly affected by defendants' attempted monopolization (notebooks, desktop computers, servers, etc.).  Accordingly, any effects on the U.S. market for finished computer goods are not effects linked to the relevant market of USB 3.0 connectors manufactured and sold in China.[91]

To the extent that defendants' foreign anti-competitive conduct may result in higher computer prices and less competition here in the U.S., those effects are simply too attenuated to establish the proximate causation required by the FTAIA.  This conclusion is well supported by existing case law.  In *Boyd*, for example, wheat farmers in the United States brought Sherman Act claims against

---

[89]     Memorandum of Law in Support of Defendants' Motion to Dismiss Plaintiff's First Amended Complaint at 10 (citations omitted, emphasis in original).

[90]     *See* FAC ¶ 65.

[91]     *See In re Intel Corp. Microprocessor Antitrust Litig.*, 452 F. Supp. 2d 555, 561 (D. Del. 2006) ("AMD's allegations refer to the computer market and not the microprocessor market, and therefore, the effects to which AMD refers are not effects linked to the relevant market.").

defendant AWB, an Australian company responsible for bulk wheat exports from Australia.[92]  Plaintiffs alleged that AWB, who exported Australian-grown wheat to Iraq, was attempting to gain a monopoly on wheat sold in Iraq and thereby foreclose that market to U.S.-grown wheat.[93]  The court noted that AWB's conduct in Iraq may have been a factual, or "but for," cause in the decrease in domestic wheat prices.[94]  In rejecting such "but for" causation, however, the court explained:

> Given the multitude of "intervening developments" that simultaneously affect projected Ending Stock levels, the claimed drop in domestic wheat prices could very well have resulted from factors wholly unrelated to the alleged conspiracy.  *[S]ee In re Intel Corp.*, 452 F.Supp.2d at 561 (concluding that alleged domestic effects of challenged conduct were not "direct" because they were "premised on a multitude of speculative and changing factors affecting business and investment decisions, including market conditions, the cost of financing, supply and demand, . . . and world-wide economic and political conditions").  This is particularly true since, immediately prior to the alleged market foreclosure, wheat exports to Iraq made up less than one percent of total U.S. wheat exports, and only slightly

---

[92]    *See* 544 F. Supp. 2d at 239.

[93]    *See id.  See also id.* at 242 ("Although plaintiffs do not claim that they themselves sold or attempted to sell wheat to Iraq, they allege that AWB's conduct foreclosed U.S.-grown wheat from the Iraqi market, and that because of the global nature of the wheat pricing mechanism, this foreclosure resulted in higher Ending Stocks and  a corresponding decrease in prices at which Plaintiffs and members of the Class were able to sell their wheat in the United States.") (quotation marks and citation omitted).

[94]    *See id.* at 244.

> more than one percent of total U.S. hard red winter wheat exports.  In light of the multitude of variables affecting projected Ending Stocks, the foreclosure of the Iraqi wheat market – which increased projected Ending Stocks by approximately one percent – simply could not have been a substantial factor among the total mix of global inputs that determine Ending Stocks, and hence wheat prices, in the United States.[95]

Despite having "alleged a plausible theory of causation based on the global interrelatedness of the wheat markets," the court found that AWB's foreign conduct in Iraq was only a "but for" cause of depressed wheat prices in the United States.[96]  The court therefore held that plaintiffs "failed to demonstrate that AWB's conduct in Iraq had the kind of 'direct' effect on domestic commerce that could give rise to an antitrust claim within the jurisdictional reach of the Sherman Act."[97]

Similarly, no direct effects were found in *In re Intel*, where AMD sued Intel under the Sherman Act for alleged business practices that affected the sale of AMD's microprocessors in foreign countries.[98]  The court held that it lacked

---

[95]     *Id.* at 245 (first citation omitted, footnote omitted).

[96]     *Id.* at 246.

[97]     *Id.*

[98]     *See* 452 F. Supp. 2d at 558-59 ("AMD's microprocessor manufacturing occurs in Germany and the assembly of the German-made microprocessors into final products occurs in Malaysia, Singapore and China.  Intel contends that AMD seeks recovery for lost sales of these foreign-made microprocessors to foreign countries.").

subject matter jurisdiction over "AMD's claims that were based on lost sales of

AMD's German-made microprocessors to foreign customers,"[99] stating as follows:

> any alleged harm suffered by AMD has been directly caused by the foreign effects of Intel's alleged conduct, namely lost foreign sales.  The other "ripple effects" of Intel's foreign conduct on the U.S. market may not have arisen "but for" Intel's alleged conduct; however, "but for" causation is not the type of direct causation contemplated by the FTAIA.
>
> AMD alleges in its Complaint that Intel's alleged conduct has resulted in higher PC prices and a "loss of freedom" or consumer choice for computer purchasers in the United States.  To the extent that these effects are based on Intel's alleged foreign conduct, the Court concludes that they too are insufficient to establish the proximate causation required by the FTAIA. . . . [T]hese types of effects are not direct domestic effects of any alleged foreign conduct of Intel, but secondary and indirect effects that are also the by-product of numerous factors relevant to market conditions and the like.[100]

The court concluded that "AMD's allegations, taken in the light most favorable to

AMD, describe a foreign effect and a foreign harm that have had ripple effects for

the domestic market, but have not had any direct, substantial and reasonable effect

which would give rise to an antitrust claim within the jurisdictional reach of the

---

[99]     *Id.* at 559.

[100]     *Id.* at 561 (citation omitted).

Sherman Act."[101]

        Direct effects on U.S. commerce were found in *In re TFT-LCD (Flat Panel) Antitrust Litigation.*[102]  However, plaintiff's reliance on that case is misplaced.  *In re TFT-LCD* was an "antitrust class action stem[ming] from allegations of a global price-fixing conspiracy in the market for thin-film transistor liquid-crystal display ('TFT-LCD') panels."[103]  Defendants –  major global manufacturers of LCD panels –  manufactured their LCD panels overseas and sold them to original equipment manufacturers who assembled them into finished products which were then shipped to the United States.[104]  Plaintiffs were "a class of retail consumers who purchased products containing TFT-LCD panels in the United States."[105]  Plaintiffs claimed that defendants conspired to fix prices of TFT-LCD panels and that this "antitrust conspiracy produced artificially high prices for TFT-LCD panels, and that this overcharge was 'passed through' to consumers, causing end-users to pay inflated prices in the United States for

---

[101]    *Id.* at 563.

[102]    822 F. Supp. 2d 953 (N.D. Ca. 2011).

[103]    *Id.* at 954-55.

[104]    *See id.* at 955.

[105]    *Id.*

electronic items that contained LCD panels."[106]

Accepting plaintiffs' "pass-through" argument, the court concluded that plaintiffs identified domestic injury that is "concrete and quantifiable" and "directly traceable to the defendants' anticompetitive conduct."[107]  The court reasoned:

> adopting a definition of "direct" under which only the first sale of a product could satisfy the standard would exclude from the Sherman Act's reach a significant amount of anticompetitive conduct that has real consequences for American consumers. As this case illustrates, modern manufacturing takes place on a global scale.  The Court is skeptical that Congress intended to remove from the Sherman Act's reach anticompetitive conduct that has such a quantifiable effect on the U.S. economy.

> * * *

> Where, as here, the nature of the effect does not change in any substantial way before it reaches the United States consumer, the effect is an "immediate consequence" of the defendant's anticompetitive behavior. In other words, because the effect of defendants' anticompetitive conduct did not change significantly between the beginning of the process (overcharges for LCD panels) and the end (overcharges for televisions, monitors, and notebook

---

[106]    *Id. See also id.* at 963 ("Plaintiffs claim that the collusive activity outlined above had undeniably direct effects on the United States.  They argue that the inflated prices of LCD panels were 'passed through' to American consumers, regardless of how the LCD panels ultimately found their way into the United States.").

[107]    *Id.* at 967.

29

computers), the effect "proceeded without deviation or interruption" from the LCD manufacturer to the American retail store.   No intervening events interrupted its journey.[108]

*In re TFT-LCD* is thus distinguishable on a number of grounds.  *First*, defendants were alleged to have entered into a conspiracy to fix prices, a conspiracy whose effects were easily quantifiable.  In the instant case, there is no such direct, price-fixing activity.  *Second*, the LCD panels were a major component of the electronic products imported into the United States.[109]  Here, the USB 3.0 connector is but one component in a host of components that make up the finished products.  *Third*, defendants were in control of more than eighty percent of the LCD panels market.  Here, plaintiff does not allege its total market share of the USB 3.0 connector market versus defendants' market share, nor does it allege the market share attributable to the two USB 3.0 connectors being challenged in defendants' patent enforcement proceedings.

In sum, the effect of defendants' alleged misconduct – in making false representations before the USB-IF, in not issuing RAND-Zero licenses to Lotes and/or in bringing patent enforcement proceedings against Lotes in China – is not direct, substantial or reasonably foreseeable in the United States.  Here, only two of

---

[108]   *Id.* at 964.

[109]   *See id.* at 967.

Lotes' thirteen USB 3.0 connectors are being challenged.  As plaintiff itself

concedes, "Hon Hai has entered into licenses to [sic] its USB 3.0 patents with other

USB 3.0 Adopters."[110]  The indirect effect of defendants' conduct on prices of U.S.

computer goods, if any, cannot be quantified.  Moreover, a whole host of factors

other than the price of USB 3.0 connectors influence the price of domestic

computer products.  At most, then, defendants' conduct may cause "ripple" effects

which are simply too attenuated to bring plaintiff's foreign injury within the ambit

of the Sherman Act.  Because I conclude that the domestic injury exception to the

FTAIA is not applicable, plaintiff's Sherman Act claims are dismissed for lack of

subject matter jurisdiction.[111]

---

[110]     11/3/11 Letter from James M. Chadwick, plaintiff's counsel, to Gregory Lippetz, counsel to Hon Hai, Ex. A to the Declaration of Thomas J. Lang, defendants' attorney, in Support of Defendants' Motion to Dismiss Plaintiff's First Amended Complaint.  This Court can consider this letter as it was referenced in plaintiff's First Amended Complaint.  *See* FAC ¶ 44.

[111]     Even if I had jurisdiction, I would consider dismissing these claims as a matter of comity.  *Cf. Voda v. Cordis Corp.*, 476 F.3d 887, 901 (Fed. Cir. 2007) (holding that comity and the principle of avoiding unreasonable interference with the authority of other sovereigns dictated that a district court decline to exercise supplemental jurisdiction over foreign patent infringement claims; nothing required the United States to adjudicate such claims, it would not have been more convenient for a United States court to assume supplemental jurisdiction over such claims, foreign courts could adequately protect the foreign patent rights of a United States citizen, and the rights of foreign governments could have been prejudiced).

### C.    Plaintiff's Remaining Claims

In its Fifth Count, plaintiff seeks a declaratory judgment stating that: "the patent claims in the Asserted Patents are Necessary Claims, Lotes is licensed to Defendants' Necessary Claims by virtue of Defendants' RAND-Zero commitments or, in the alternative, Lotes has an irrevocable right to be licensed on RAND-Zero terms under the Asserted Patents."[112]

"[T]he Declaratory Judgment Act does not by itself confer subject matter jurisdiction on the federal courts."[113]  "Rather, there must be an independent basis of jurisdiction before a district court may issue a declaratory judgment."[114] Because I have found that federal subject matter jurisdiction is lacking here, plaintiff's request for declaratory judgment must also be dismissed for want of jurisdiction.  Furthermore, because there are no longer any viable federal claims, I decline to exercise supplemental jurisdiction over plaintiff's state law claims

---

[112]    FAC ¶ 102.

[113]    *Correspondent Servs. Corp. v. First Equities Corp. of Florida*, 442 F.3d 767, 769 (2d Cir. 2006) (citing 28 U.S.C. § 2201(a) ("In a case of actual controversy *within its jurisdiction* . . . any court of the United States . . . may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." (emphasis added)).

[114]    *Id.* (citing *Niagara Mohawk Power Corp. v. Tonawanda Band of Seneca Indians*, 94 F.3d 747, 752 (2d Cir. 1996)).

(breach of contract, promissory estoppel, waiver and tortious interference).[115]
Accordingly, the First Amended Complaint is dismissed in its entirety.

### D.    Leave to Amend

Plaintiffs are typically granted leave to amend at least once.  In this case, however, plaintiff received notice of the deficiencies in its original Complaint at a court conference held on December 4, 2012, and in a letter from opposing counsel which preceded the conference.[116]  Plaintiff took the opportunity and filed the First Amended Complaint two weeks later.  Now, while the motion to dismiss was pending, plaintiff seeks leave to add three new plaintiffs – wholly-owned subsidiaries of Lotes – in its proposed Second Amended Complaint.  One of the subsidiaries, LT Connect, Inc., is an Oregon corporation.  The proposed Second Amended Complaint does not contain a single allegation by LT Connect concerning any of the defendants.[117]  Nor does it allege that LT Connect manufactures USB 3.0 connectors or was otherwise harmed by defendants'

---

[115]    *See* 28 U.S.C. § 1367(c)(3).

[116]    *See* 12/4/12 Transcript at 5-6 ("I'm telling you now that, with the benefit of the letter and the brief, if you want to amend, I will let you amend, and tell [defendants] to move against the best possible complaint . . . and my decision will not end with [the words] 'leave to amend is granted.'").

[117]    *See* 5/2/13 Letter from Brian A. Herman, defendants' counsel, at 3.

conduct.[118]  Thus, LT Connect has no real interest in this litigation.  Plaintiff's request to amend is a transparent attempt to create diversity jurisdiction in the event its antitrust claims are dismissed.  This Court will not countenance unnecessary joinder in a blatant attempt to manufacture jurisdiction.[119]

In sum, the First Amended Complaint is dismissed for lack of subject matter jurisdiction.  This defect cannot be cured by amendment.  Because there is no valid reason to amend, amendment would be futile.  Plaintiff's request for further leave to amend is, therefore, denied.

## IV.   CONCLUSION

For the foregoing reasons, this case is dismissed.  The Clerk of the Court is directed to close defendants' motions to dismiss (Docket Entries # 28 and 40 ) and this case.

---

[118]    *See id.*  Plaintiff's counsel states that, "[o]n information and belief, LT Connect works closely with Lotes' customer Intel, selling, marketing and facilitating the development of USB 3.0 connectors . . . ."  5/10/13 Letter from Nicolas S. Gikkas at 1-2.  This statement, which is inexplicably based on information and belief, is too attenuated to establish the type of harm needed to confer standing on LT Connect.

[119]    *Cf. Airlines Reporting Corp. v. S & N Travel, Inc.*, 58 F.3d 857, 862-63 (2d Cir. 1995) (stating that a parent company cannot attempt to create federal diversity jurisdiction by assigning its claim to one of its subsidiaries).

SO ORDERED:

_____
Shira A. Scheindlin
U.S.D.J.

Dated:      New York, New York
            May 14, 2013

**- Appearances -**

**For Plaintiff:**

Nicolas S. Gikkas, Esq.                  Lewis E. Hudnell, Esq.
The Gikkas Law Firm                      Colvin Hudnell LLP
P.O. Box 2247                            375 Park Avenue, Suite 2607
Saratoga, CA 95070                       New York, NY 10152
(408) 868-7726                           (347) 855-4772


**For Defendants:**

Thomas J. Lang, Esq.
J. Clayton Everett, Jr., Esq.
Swati V. Rawani, Esq.
Morgan, Lewis & Bockius LLP
1111 Pennsylvania Avenue, N.W.
Washington, D.C. 20004
(202) 739-5609